PITTSBURGH CONSTRUCTION
COMPANY, Appellee,

v.

Paul GRIFFITH and Saundra
Griffith, Appellants.

Pittsburgh Construction Company,
Appellant,

v.

Paul Griffith and Saundra
Griffith, Appellees.

Superior Court of Pennsylvania.

Argued March 12, 2003.

Filed Oct. 6, 2003.

Brenda B. Sebring, Monroeville, for Griffith.

Paul R. Robinson, Pittsburgh, for Pittsburgh Construction Company.

BEFORE: TODD, BENDER, and KELLY, JJ.

OPINION BY KELLY, J.:

¶ 1 In these consolidated appeals and cross-appeals of Paul and Saundra Griffith ("Griffiths") and Pittsburgh Construction Company ("PCC"), we are asked to determine several issues regarding the jury awards on claims for breach of contract and conversion in favor of PCC and against the Griffiths for the Griffiths' failure to release payments due PCC pursuant to the contract for construction of the Griffiths' residence. In addition to claims challenging the sufficiency and weight of the evidence, the Griffiths ask us to review whether PCC's conversion claim was prop-

erly submitted to the jury. PCC asks whether a contractually created 18% pre-judgment and post-judgment interest rate should apply to the judgments. We hold that the trial court should not have submitted the conversion claim to the jury because the "gist of the action" was the contract claim. We also hold that PCC, the prevailing party, was nevertheless aggrieved by the verdict, which did not award the interest PCC sought under the construction contract. Thus, PCC was entitled to cross-appeal from the judgment as an aggrieved party. We further hold that the contractual interest rate of 18% should apply to PCC's breach of contract judgment, rather than the statutory rate of 6%. Thus, after careful review of the issues raised by the parties, we affirm in part, reverse in part, and remand the case for further proceedings consistent with this opinion.

¶ 2 The relevant facts and procedural history of this case are as follows. On April 24, 1999, the Griffiths contracted with PCC for construction of a home in the Summerlawn plan of lots in Sewickley, Pennsylvania. The contract price of the home was $310,935. Prior to entering into the agreement with the Griffiths, PCC had already constructed at least 16 other homes in the Summerlawn plan, including the home of PCC's owner and president, Timothy Murphy ("Murphy"). Barring any changes requested by the Griffiths or unforeseen weather problems, the home was to be completed in six (6) months, on or around December 8, 1999. Delay damages for failing to complete the home within six months were set at $250 per day. Additionally, the parties agreed that if the Griffiths withheld final payment when due without cause, an 18% interest rate applied to the unpaid sums until the sums were paid in full. The Griffiths were not supposed to occupy the house until PCC was fully paid.

¶ 3 Throughout the course of PCC's construction, the Griffiths requested multiple changes to the original construction plan. The home was not substantially completed until March 8, 2000, when a conditional occupancy permit was granted. A final occupancy permit was issued on April 17, 2000, at which time the Griffiths took possession of their home. On the same date, the Griffiths instructed PCC by letter that PCC was no longer allowed to enter the Griffiths' property. At some time prior to taking possession of the home, the Griffiths also instructed their bank, Dollar Bank, to withhold the final two payment draws. When they moved into the home on April 17, 2000, the Griffiths still owed PCC two payment disbursals that totaled approximately $111,249.31.

¶ 4 On May 9, 2000, PCC filed a complaint against the Griffiths alleging claims of breach of contract and conversion. On December 8, 2000, the Griffiths filed an answer and counterclaims, alleging breach of contract, breach of implied warranties, fraud, violation of the Pennsylvania Unfair Trade Practices Act, and violation of the Moss–Magnunson Warranty Act. The fraud and Moss–Magnunson claims were dismissed by the trial court. The case proceeded to trial on the remaining claims. On November 26, 2001 the jury awarded $111,684.74 to PCC on its breach of contract claim, and $25,000 on its conversion claim. The jury found against the Griffiths on their counterclaims.

¶ 5 On November 29, 2001, PCC filed a post-trial motion to mold the verdict to reflect the contractual 18% interest rate on the judgments. The Griffiths filed a motion for post-trial relief on December 6, 2001. PCC filed an additional motion for post-trial relief on December 12, 2001.

¶ 6 Although oral arguments were set for April 24, 2002, the court nevertheless

failed to dispose of the post-trial motions within 120 days of the filing of the first post-trial motion. Consequently, PCC *praeciped* for entry of judgment on April 8, 2002 in the amount of $178,912.88, which consisted of the combined breach of contract and conversion awards of $136,684.74 plus prejudgment interest on the awards at a rate of 18%. PCC unilaterally entered judgment in this amount without approval by the trial court. Before PCC could execute on the judgment, the Griffiths appeared before motions court on April 10, 2002 with emergency motions to strike judgment, stay execution and set aside writ of execution. After hearing arguments from both parties, motions court entered the original $136,684.74 verdict and added post-judgment interest only at the statutory rate of 6%. The April 10th judgment and order also stayed execution on the judgment until April 22, 2002. On April 24, 2002, execution on the judgment was further stayed until May 6, 2002. The Griffiths filed an appeal from the April 10, 2002 order on May 7, 2002. On May 8, 2002, PCC filed cross-appeals from both the April 8th judgment and April 10th judgment and order.

¶ 7 At appeal No. 796 WDA 2002, the Griffiths raise the following issues for review:

WHETHER THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING [THE] GRIFFITHS' MOTION FOR JNOV ON THE JURY VERDICT IN FAVOR OF PCC FOR BREACH OF CONTRACT BECAUSE THE JURY VERDICT WAS UNSUPPORTED BY SUFFICIENT EVIDENCE?

WHETHER THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING [THE] GRIFFITHS' MOTION FOR JNOV ON THE JURY VERDICT IN FAVOR OF PCC FOR CONVERSION BECAUSE THE JURY VERDICT WAS UNSUPPORTED BY SUFFICIENT EVIDENCE?

WHETHER THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING [THE] GRIFFITHS' MOTION FOR A NEW TRIAL BECAUSE THE JURY VERDICT FOR BREACH OF CONTRACT IN FAVOR OF PCC WAS AGAINST THE WEIGHT OF THE EVIDENCE?

WHETHER THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING [THE] GRIFFITHS' MOTION FOR A NEW TRIAL BASED UPON THE MISTAKE OF PERMITTING THE ENTRY OF PHOTOGRAPHS OF [THE] GRIFFITHS' FURNISHED HOUSE INTO EVIDENCE, WHICH PHOTOGRAPHS WERE IRRELEVANT, MISLEADING AND NOT PROVIDED TO [THE] GRIFFITHS DURING DISCOVERY DESPITE APPROPRIATE DISCOVERY REQUESTS?

WHETHER THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING [THE] GRIFFITHS' MOTION FOR A NEW TRIAL BASED UPON THE MISTAKE OF PERMITTING THE ENTRY OF PHOTOGRAPHS OF HOUSES CONSTRUCTED BY [THE] GRIFFITHS' CONSTRUCTION EXPERT, WILLIAM WEAVER, INTO EVIDENCE, WHICH PHOTOGRAPHS WERE IRRELEVANT, MISLEADING, AND ILLEGALLY OBTAINED BY PCC AND WERE NOT PROVIDED TO [THE] GRIFFITHS DURING DISCOVERY DESPITE APPROPRIATE DISCOVERY REQUESTS?

(Griffiths' Brief at 2).

¶ 8 We first address PCC's contention that the Griffiths' appeal should be quashed because the Griffiths appealed from the wrong order. PCC asserts that

the entry of judgment pursuant to Pa. R.C.P. 227.4(1)(b) on April 8, 2002 was the final disposition of the case for purposes of appeal. PCC maintains the April 10th judgment and order was a mere modification of the final judgment of April 8th that did not dispose of issues related to the jury verdict. Thus, PCC believes the Griffiths have waived any challenges to the jury verdict because they appealed the April 10th judgment and order but not the April 8th judgment. We do not agree.

¶ 9 Ordinarily, an appeal may only be taken from a final order. Pa.R.A.P. 341(a). A final order is one that is intended to be final as to all parties and to the whole subject matter. *Pace v. Thomas Jefferson University Hosp.*, 717 A.2d 539 (Pa.Super.1998); Pa.R.A.P. 341(b)(1). Upon *praecipe* of a party, the prothonotary shall enter judgment upon a jury verdict if one or more timely post-trial motions are filed and the trial court does not enter an order disposing of all orders within 120 days after the filing of the first motion. Pa.R.C.P. 227.4(1)(b). Judgment entered pursuant to Rule 227.4(1)(b) is final as to all parties and all issues and shall not be subject to reconsideration. Pa. R.C.P. 227.4(1)(b). *See also Conte v. Hahnemann University Hosp.*, 707 A.2d 230 (Pa.Super.1998), *appeal denied*, 555 Pa. 731, 725 A.2d 181 (1998) (holding when judgment entered pursuant to Rule 227.4(1)(b), case is ready in its entirety for appellate process). A party has thirty days to appeal a judgment entered pursuant to Rule 227.4(1)(b). *See Morningstar v. Hoban*, 819 A.2d 1191 (Pa.Super.2003); Pa.R.A.P. 903(a).

¶ 10 PCC entered judgment pursuant to Rule 227.4(1)(b) on April 8, 2002,[1] in the amount of $178,912.88. This entry of judgment was final for purposes of appellate review. *See* Pa.R.C.P. 227.4(1)(b); *Conte, supra.* However, the court modified the April 8th judgment to $139,718.19 in an order entered two days later on April 10, 2002. The Griffiths filed their appeal on May 7, 2002, the thirtieth (30th) day following the entry of final judgment on April 8, 2002. Thus, the Griffiths' appeal was timely as to the April 8th judgment even if they mistakenly claimed to have appealed from the April 10th judgment and order. *See Morningstar, supra;* Pa.R.A.P. 903(a). Due to the timeliness of the Griffths' appeal, we decline to quash it because of this technical error.

¶ 11 We will now proceed to address the Griffiths' arguments on appeal. The Griffiths first argue that PCC failed to build their home in accordance with the construction contract. In support of this contention, the Griffiths provide a laundry list of alleged defects in the construction of their home, including a cracked garage floor, leaky roof, unsafe electrical wiring, uneven drywall, unfinished concrete work, and unfinished grading and landscaping. The Griffiths also complain the frame of their entire home was "out of square."[2] Furthermore, the Griffiths believe they are entitled to contractual delay damages because their home was not timely constructed in six months. For these reasons, the Griffiths insist PCC failed to build their home to the standard set forth in the construction contract. Thus, the Griffiths submit they properly withheld the final payments from PCC, and the jury verdict against them on PCC's breach of contract claim must have been a result of the jury's prejudice and passion. The Griffiths con-

---

1. PCC filed the first post-trial motion on November 29, 2001. The 120th day following the filing of this motion was March 28, 2002.

2. A home is perfectly "square" when it walls are perpendicular to, or form 90 angles with, the floors and ceilings.

clude the trial court should have granted their motion for judgment notwithstanding the verdict ("JNOV") on the jury's breach of contract award to PCC. We cannot agree.

¶ 12 When reviewing a trial court's decision not to grant judgment in favor of one of the parties, we must consider the evidence, together with all favorable inferences drawn therefrom, in a light most favorable to the verdict winner. *Ty–Button Tie, Inc. v. Kincel and Co., Ltd.*, 814 A.2d 685 (Pa.Super.2002). We will reverse a trial court's denial of JNOV only when the outcome of the case was controlled by an abuse of discretion or error of law. *Whittington v. Episcopal Hospital*, 768 A.2d 1144, 1149 (Pa.Super.2001). Furthermore:

> An order granting JNOV is appropriate if the movant is entitled to judgment as a matter of law and/or the evidence presented at trial was such that the verdict would be in favor of the movant. With the former, the court is to review the record and determine whether, even with all factual inferences decided adversely to the movant, the law nonetheless requires a verdict in its favor. With the latter, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Id.* (quoting *Robinson v. Upole*, 750 A.2d 339 (Pa.Super.2000)). "Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact.... A JNOV should be entered only in a clear case." *Buckley v. Exodus Transit & Storage Corp.*, 744 A.2d 298, 304–05 (Pa.Super.1999).

¶ 13 To support a claim for breach of contract, a plaintiff must allege: 1) the existence of a contract, including its essential terms; 2) a breach of a duty imposed by the contract; and 3) resultant damage. *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa.Super.1999). The purpose of damages in a breach of contract case is to return the parties to the position they would have been in but for the breach. *Birth Center v. St. Paul Companies, Inc.*, 567 Pa. 386, 787 A.2d 376 (2001).

¶ 14 At trial in the instant matter, the parties entered a voluminous amount of detailed evidence and testimony about the alleged defects in the construction of the Griffiths' home. For instance, the Griffiths' evidence regarding the "defective" cracked garage floor was countered by PCC with photographs of the floor and testimony suggesting the Griffiths had exaggerated any "cracking" of the floor and the need for its replacement. Also, the Griffiths' allegation of untimely construction of their home was belied by evidence that the Griffiths requested so many changes during the course of construction as to delay construction, and were well aware these requests would affect their home's timely completion. Murphy, the owner of PCC, testified that the defects complained of by the Griffiths are typically problems he would address under the home warranty, after construction was complete and final payment was made.

¶ 15 Moreover, the credibility of William Weaver ("Weaver"), the Griffiths' expert, who testified about PCC's allegedly substandard workmanship, was assailed on several occasions. On cross-examination, Weaver admitted that many of the "defects," such as leaks, concrete cracks, and visible ball joints, were common problems that could be fixed by the contractor under the home's warranty. Weaver also admitted some of the high-price homes his own company constructed are slightly "out of square," which discounted his previous tes-

timony that the "out of square" framing of the Griffiths' home is evidence of workmanship falling below the industry standard.

¶ 16 Despite the numerous alleged defects, the Griffiths admit they were able to obtained an occupancy permit and took possession of their home on April 17, 2000, without paying PCC an excess of $111,000 due under the contract. The Griffiths concede that in a letter dated the same day they took possession of the home, they instructed PCC it was no longer permitted to enter onto their home property. Thus, PCC was effectively barred from remedying any defect with the Griffiths' home after that date. Under these circumstances, there is ample evidence on the record to support the jury's credibility determinations and fact finding in favor of PCC on its breach of contract claim. *See Buckley, supra.* Thus, we conclude JNOV in favor of the Griffiths was not warranted. *See Whittington, supra.*

¶ 17 Next, the Griffiths argue that PCC failed to make out all the elements of its conversion claim. The Griffiths note that a plaintiff must demonstrate a present possessory right to the chattel in question before plaintiff can claim conversion. The Griffiths concede their duty to pay PCC under the terms of the contract. They also admit they instructed their bank to withhold the final two payments, which remained in escrow with Dollar Bank. However, the Griffiths allege they had no obligation to deliver to PCC the specific funds held in escrow. The Griffiths submit their withholding of the escrowed funds merely amounted to a failure to pay a debt, because PCC allegedly had no right to the specific funds held in the escrow account. The Griffiths assert that their failure to pay a debt to PCC cannot be the ground for a tort action sounding in conversion. Otherwise, the Griffiths maintain, nearly every instance of an unpaid debt would trigger a conversion action.

¶ 18 Further, the Griffiths complain there was no evidence on the record to support the $25,000 award against them on PCC's conversion claim. The Griffiths believe this award was a duplicate of the award for breach of contract damages. The Griffiths conclude the trial court should have granted their motion for JNOV on PCC's conversion award. We agree in part.

¶ 19 Conversion is a tort by which the defendant deprives the plaintiff of his right to a chattel or interferes with the plaintiff's use or possession of a chattel without the plaintiff's consent and without lawful justification. *Chrysler Credit Corporation v. Smith*, 434 Pa.Super. 429, 643 A.2d 1098, 1100 (1994), *appeal denied*, 539 Pa. 664, 652 A.2d 834 (1994). "A plaintiff has a cause of action in conversion if he or she had actual or constructive possession of a chattel at the time of the alleged conversion." *Id.* Money may be the subject of conversion. *Francis J. Bernhardt, III, P.C. v. Needleman*, 705 A.2d 875, 878 (Pa.Super.1997) (quoting *Shonberger v. Oswell*, 365 Pa.Super. 481, 530 A.2d 112, 114 (1987)). However, the failure to pay a debt is not conversion. *Id.*

¶ 20 In general, courts are cautious about permitting tort recovery based on contractual breaches. *See Glazer v. Chandler*, 414 Pa. 304, 308, 200 A.2d 416, 418 (1964); *Bash v. Bell Telephone Company of Pennsylvania*, 411 Pa.Super. 347, 601 A.2d 825 (1992). In keeping with this principle, this Court has recognized the "gist of the action" doctrine, which operates to preclude a plaintiff from re-casting ordinary breach of contract claims into tort claims. *eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 14 (Pa.Super.2002). The conceptual distinction be-

tween a breach of contract claim and a tort claim has been explained as follows:

> Although they derive from a common origin, distinct differences between civil actions for tort and contractual breach have been developed at common law. Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals.... To permit a promisee to sue his promisor in tort for breaches of contract *inter se* would erode the usual rules of contractual recovery and inject confusion into our well-settled forms of actions.

*Id.* (quoting *Bash, supra* at 829). However, a breach of contract may give rise to an actionable tort where the wrong ascribed to the defendant is the gist of the action, the contract being collateral. *Id.* "The important difference between contract and tort claims is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie from the breach of duties imposed by mutual consensus." *Id.* (quoting *Redevelopment Auth. v. International Ins. Co.*, 454 Pa.Super. 374, 685 A.2d 581, 590 (1996) (*en banc*), *appeal denied*, 548 Pa. 649, 695 A.2d 787 (1997)). "In other words, a claim should be limited to a contract claim when the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied by the law of torts." *Id.* (*quoting Bohler–Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 104 (3rd Cir.Pa.2001), *cert denied*, 534 U.S. 1162, 122 S.Ct. 1173, 152 L.Ed.2d 116 (2002)).

¶ 21 In *eToll, Inc.*, the appellant, software designer eToll, Inc. ("eToll"), entered into a contract with Elias/Savion Advertising ("Elias/Savion"), to market e-mail software. *Id.* at 12. Elias/Savion allegedly failed to perform under the contract, and eToll brought suit alleging breach of contract, breach of fiduciary duty, fraud, and professional negligence. *Id.* The trial court dismissed the negligence and fraud counts based on the "gist of the action" doctrine. *Id.* at 13. On appeal, eToll argued his fraud claim should not have been dismissed. Acknowledging that our Supreme Court has not explicitly recognized the "gist of the action" doctrine, this Court analyzed federal decisions interpreting Pennsylvania law on this point:

> [Federal courts interpreting Pennsylvania law] have held the [gist of the action] doctrine bars torts claims: (1) arising solely from a contract between the parties (*[Galdieri v. Monsanto Co.*, 245 F.Supp.2d 636 (E.D.Pa.2002)]*); (2) where the duties allegedly breached were created and grounded in the contract itself (*[Werner Kammann Maschinenfabrik, GmbH, v. Max Levy Autograph, Inc.*, 2002 WL 126634, 47 UCC Rep.Serv.2d 1023 (E.D.Pa. Jan 31, 2002)]*); (3) where the liability stems from a contract (*[Asbury Automotive Group LLC v. Chrysler Ins. Co.*, 2002 WL 15925 (E.D.Pa. Jan.27, 2002)]*); or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract (*[Polymer Dynamics, Inc. v. Bayer Corp.*, 2000 WL 1146622, RICO Bus.Disp.Guide 9936 (E.D.Pa. Aug 14, 2000)]*).

*Id.* at 18 (internal quotation marks omitted). Accordingly, this Court concluded:

> All of [eToll's] alleged acts of fraud arose in the course of the parties' contractual relationship. Moreover, [Elias/Savion's] duties regarding...performance were created and grounded in the parties' contract. Finally, these are the types of damages which would be compensable in an ordinary contract ac-

tion; thus, the claim would essentially duplicate a breach of contract action to recover the allegedly overbilled charges. The fraud at issue was not so tangential to the parties' relationship so as to make the fraud the gist of the action. Rather, we conclude that the fraud claims are inextricably intertwined with the contract claims.

*Id.* at 20–21. Thus, this Court held that the trial court properly barred eToll's fraud claim under the "gist of the action" doctrine. *Id.*

¶ 22 In the instant case, the Griffiths' borrowed funds were placed in an escrow account with their bank, to be disbursed to PCC incrementally according to a draw schedule. The draw schedule was divided into six separate payment dispersals, one for finishing each of six respective stages of construction: foundation; framing with windows; mechanical rough-ins; exterior finish, dry wall; trim; and final. The construction contract also instructed that funds associated with any incomplete construction at the time of occupancy would be held in escrow. Prior to distributing a draw to PCC, Dollar Bank would send an investigator to the home to assess the degree of completion. On March 2, 2002, after Dollar Bank's last inspection of the house, the investigator reported the exterior was "99%" complete, and recommended release of the "exterior" draw. (N.T. Trial, 11/19/01, at 302–03). Dollar Bank did not conduct a final draw inspection. Every draw, except the "exterior" and "final" draws had been distributed to PCC when the Griffiths instructed Dollar Bank to withhold further payment. The Griffiths were concerned about both the quality and the timeliness of PCC's construction, and withheld payment to assess any further offset they might be owed.[3] The Griffiths

moved into the home on April 17, 2000 still owing PCC the final two draws, which amounted to more than $111,000. The Griffiths allege the cost of repairing the defects in their home will exceed $111,000.

¶ 23 Because the funds were placed in escrow for the sole purpose of paying PCC according to the draw schedule, PCC had a possessory interest in the escrowed funds to the extent that the corresponding amount of construction had been completed. *See Bernhardt, III, P.C., supra* (holding attorney who was promised referral fee by another firm had sufficient possessory interest in eventual settlement to bring conversion action, where firm refused to pay fee). Thus, at least with respect to the "exterior" draw, which Dollar Bank's inspector recommended for dispersal, the Griffiths interfered with PCC's possessory right to the escrowed funds by instructing the bank not to pay PCC. *Id.* However, we are not convinced the Griffiths' justification for withholding the funds was sufficiently unlawful to warrant a separate action against them for tortious conversion. Here, Dollar Bank withheld the final two draws from PCC because the Griffiths believed the cost of remedying PCC's defective construction was greater than the money they still owed under the contract. As per the contract, the disputed funds remained in escrow with Dollar Bank, available to neither party, while the parties litigated their various claims and counterclaims. Notwithstanding the fact that PCC eventually prevailed on its breach of contract claim, we conclude that under these circumstances the Griffiths did not act without lawful justification when they instructed Dollar Bank to stop payments under the draw schedule. *See Chrysler Credit Corporation, supra.*

---

**3.** Throughout the course of construction, PCC had granted several "credits" toward the con-

tract price for construction the Griffiths had performed themselves.

¶ 24 Moreover, the basis of the duty allegedly breached by the Griffiths, their duty to pay PCC according to the draw schedule, was created by and defined by the contract itself. *See eToll, Inc., supra* at 19. Much like the petitioner in *eToll*, here PCC's tort and breach of contract claims are inextricably intertwined, the success of the conversion claim depending entirely on the obligations as defined by the contract. *Id.* at 21. Thus, in this instance we will not permit PCC to interject a claim for tortious conversion into an action that is decidedly contractual. The contractual remedies available to PCC are sufficient to compensate it for the losses it suffered from the Griffiths refusal to release the scheduled draw payments. Our decision is consistent with this Court's application of the "gist of the action" doctrine, as well as the more general policy disfavoring tort recovery based on a contractual breach. *See Glazer, supra; eToll, Inc., supra; Bash, supra.* Therefore, we hold that the jury should not have been charged on conversion, and reverse the conversion judgment in favor of PCC. Consequently, we need not address the Griffiths' claim that the record did not support the $25,000 conversion verdict.

¶ 25 Next, the Griffiths assert that they are entitled to a new trial because the breach of contract verdict in favor of PCC was against the weight of the evidence. Relying on the arguments made in their argument for JNOV, the Griffiths conclude that the jury's verdict is so contrary to the evidence that it shocks one's sense of justice. We do not agree.

¶ 26 In general, a new trial will be granted on the basis that it is against the weight of the evidence only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice, and a new trial is necessary to remedy the situation. *Lanning v. West,* 803 A.2d 753,

765 (Pa.Super.2002). When deciding whether a verdict was against the weight of the evidence, we need not view the evidence in the light most favorable to the verdict winner. *Id.* "A new trial will not be granted on the ground that the verdict is against the weight of the evidence where the evidence is conflicting and the fact finder could have decided in favor of either party." *Id.*

¶ 27 Here, we have already determined the evidence presented by the parties in this case was conflicting, and the record contains ample support for the jury's credibility determinations and balancing of the evidence. Moreover, the Griffiths fail to develop their argument beyond a mere reference to their previous argument for JNOV on the breach of contract claim. *See Kituskie v. Corbman,* 452 Pa.Super. 467, 682 A.2d 378, 383 (1996) (holding issues not properly developed or argued in argument section of appellate brief are waived). Thus, the Griffiths' weight of the evidence claim merits no relief. *See id.*

¶ 28 The Griffiths next take issue with the trial court's admission of photographs of the Griffiths' completed home. The Griffiths allege that these pictures, including many shots of the home's completely furnished interior, were irrelevant and highly prejudicial because they did not focus on the alleged defects of the home. The Griffiths contend PCC's photographs were misleading because they were taken at such angles and distances as to completely conceal any evidence of faulty or defective construction. Moreover, the Griffiths complain that despite their discovery requests, PCC never supplied some of these pictures to the Griffiths prior to trial, thereby prejudicing the Griffiths' ability to prepare appropriate rebuttal testimony. For these reasons, the Griffiths propose they are entitled to a new trial. We do not agree.

¶ 29 Generally, all relevant evidence is admissible. Pa.R.E. 402. Relevant evidence is described as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Pa.R.E. 401. However, relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice. Pa.R.E. 403. "Prejudice...does not mean detrimental to a party's case, but rather, an undue tendency to suggest a decision on an improper basis." *Leahy v. McClain*, 732 A.2d 619, 625 (Pa.Super.1999), *appeal denied*, 561 Pa. 698, 751 A.2d 192 (1999) (quoting *Sprague v. Walter*, 441 Pa.Super. 1, 656 A.2d 890, 909 (1995), *appeal denied*, 543 Pa. 730, 673 A.2d 336 (1996)) (internal quotation marks omitted). The admission of photographs into evidence is within the discretion of the trial court. *Palmosina v. Laidlaw Transit Company, Inc.*, 445 Pa.Super. 121, 664 A.2d 1038 (1995).

¶ 30 The grant of a new trial is a decision within the discretion of the trial court. *Duncan v. Mercy Catholic Medical Center of Southeastern Pennsylvania*, 813 A.2d 6, 9–10 (Pa.Super.2002). When reviewing an order denying a new trial, our standard of review is to decide whether the trial court committed an error of law that controlled the outcome of the case or committed an abuse of discretion. *Id.* at 10 (citing *Fanning v. Davne*, 795 A.2d 388 (Pa.Super.2002)). Furthermore:

An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, discretion is abused. Nor does our determination in this regard turn on whether this Court might have reached a different conclusion, but depends instead on whether there was such lack of

support for the trial court's action as to render it clearly erroneous.

*Id.* The correct remedy when improperly admitted evidence may have affected a verdict is the grant of a new trial. *Id.* at 12. However, the erroneous admission of evidence is not considered ground for a new trial where no harm or prejudice has resulted. *Id.*

¶ 31 In the instant case, PCC was permitted to enter the Griffiths' property in March 2001 to take photographs of the home. At trial, the Griffiths objected to the admission of any of these pictures not representing a specific defect alleged in their complaint against PCC. PCC countered that these photographs were necessary to rebut the Griffiths' general allegations that all of PCC's construction was of substandard workmanship. After hearing extensive argument by both parties, the trial court ruled:

THE COURT: You can't preface your case on everything being bad and saying I don't want to show these [photographs of the home].

[GRIFFITHS]: We're not saying that.

[PCC]: You did. That is why I took these pictures based on the complaint.

THE COURT: You said that everything was bad and he took those pictures based on that. What can I tell you? I will allow them in except what [the Griffiths] have [built]. If [PCC hasn't built] it, then I don't want it in....

(N.T. Trial, 11/16/01, at 93–4). Accordingly, the trial court permitted PCC to introduce only those photographs representing items of the house they had constructed. We agree with the trial court that these photographs were directly relevant to the issue of PCC's allegedly substandard construction of the Griffiths' home. *See* Pa. R.E. 401. In defending against the Griffiths' allegation of substandard workmanship, PCC was entitled to present its own

photographic evidence on the subject. The fact that these photographs do not depict a shoddily constructed home is entirely PCC's case. Although some of the photographs suggest that the Griffiths' home is lavishly furnished and decorated, any prejudice resulting from this impression of opulence is outweighed by the probative value of the photographs. *See Leahy, supra.*

■ ¶ 32 Furthermore, the record contains conflicting evidence about whether these photographs were properly provided to the Griffiths during pretrial discovery. Yet, it is undisputed that PCC was allowed to enter the Griffiths' home on March 23, 2001 for the express purpose of obtaining photographic evidence regarding the Griffiths' counterclaims. This photography session was arranged in coordination with the Griffiths' counsel, who was also present at the house during the shoot. The photographs allegedly withheld by PCC were all photographs taken during the March 23rd shoot. Assuming *arguendo* that these pictures were not properly provided to the Griffiths during discovery, the Griffiths can hardly complain they were unfairly surprised by photographs of their own house, taken under the supervision of their own legal counsel. *Compare Bindschusz v. Phillips,* 771 A.2d 803 (Pa.Super.2001), *appeal denied,* 567 Pa. 754, 790 A.2d 1012 (2001) (holding trial court in malpractice action properly withheld videotaped evidence of plaintiff engaging in physical activity, where videotape was taken two days before trial, defendant failed to supplement interrogatory answers to include evidence, and failed to list videotape as potential trial exhibit, because plaintiff unfairly surprised and prejudiced by evidence). Therefore, we conclude the admission of PCC's photographs of the Griffiths' home was within the trial court's discretion, and hold that a new trial was

not warranted on this basis. *See Duncan, supra; Palmosina, supra.*

■ ¶ 33 Finally, the Griffiths argue that photographs of model houses built by their expert witness, Weaver, were inadmissible to impeach Weaver's testimony about the quality of PCC's workmanship. Weaver is the owner of Weaver Master Builders, Incorporated, a custom builder of up-scale, single-family homes of a size, type and price similar to the Griffiths' home. The photographs were introduced by PCC after Weaver testified he did not know if any of the homes he built were similarly "out of square." The photographs demonstrated that at least some of Weaver's "spec" or "model" homes contained walls that were "out of square." The Griffiths maintain that these photographs were irrelevant, misleading, not authenticated, illegally obtained, and were not properly provided to them during pretrial discovery. Thus, the Griffiths conclude the trial court erroneously denied their motion for a new trial. We cannot agree.

¶ 34 Here, Weaver testified on direct examination, "The areas [of the Griffiths' home] I had paid attention to and looked at were probably below what I would term a level of workmanship that is acceptable in our line of work." (N.T. Trial, 11/20/01, at 468). To illustrate his point, Weaver testified extensively about how the walls of the Griffiths' home were "out of square." The implication of Weaver's testimony was that PCC did not comply with the industry standard of construction when it failed to construct a perfectly square home. On cross-examination, Weaver testified he did not know if any of the up-scale homes he built were similarly "out of square." PCC confronted Weaver with photographs of several of Weaver's spec homes that appeared "out of square." These photographs were properly authenticated by

Murphy, the owner of PCC, who took the pictures.[4] *See Commonwealth v. Rovinski*, 704 A.2d 1068, 1074 (Pa.Super.1997), *appeal denied*, 555 Pa. 707, 723 A.2d 1024 (1998) (holding photograph must be authenticated by witness testimony with sufficient knowledge that photograph is fair and accurate representation of relevant scene). The photographs were relevant because they were used to impeach Weaver's testimony that constructing an "out of square" home falls below the industry standard of workmanship. *See* Pa.R.E. 401.

¶ 35 Regarding the Griffiths' claim that the photographs of Weaver's spec homes were obtained illegally, Murphy testified he gained access to the spec homes through his wife, a real estate agent. There is no further evidence of record regarding the Griffiths' unsubstantiated allegations of dishonesty, subterfuge, and criminality on the part of Murphy and PCC. The Griffiths declined to cross-examine Murphy on his method of obtaining the photographs, and did not elicit any further evidence on the matter. Moreover, the Griffiths provide no legal support for their argument, save for a citation to the statutory definition of burglary, and a vague allegation that PCC violated the code of professional responsibility, when it failed to disclose the supposed illegality to the court. Accordingly, the Griffiths have failed to develop this argument sufficiently, and we will give it no more attention. *See Kituskie, supra*.

■ ¶ 36 Finally, we turn to the Griffiths' assertion that they should be granted a new trial because the Weaver photographs were not provided to them during

pretrial discovery. PCC admits it did not furnish these photographs to the Griffiths. However, the Griffiths' discovery request were not made part of the certified record, and there is no evidence that suggests the Griffiths even requested this evidence.[5] Moreover, both cases cited by the Griffiths involved videotaped evidence of the plaintiff party being intentionally withheld during a medical malpractice action. *See Duncan, supra; Bindschusz, supra*. In the present case, PCC withheld, perhaps intentionally, photographic impeachment evidence of the Griffiths expert witness. The admission of this evidence did not have an undue tendency to suggest a decision on an improper basis; rather, it served only to impeach Weaver's testimony that a slightly out of square home is indicative of shoddy construction below industry standards. *See Leahy, supra*. In this situation, particularly where we cannot ascertain whether the photographs were ever properly requested, we decline to hold the admission of this evidence unfairly surprised or prejudiced the Griffiths to a degree warranting a new trial. *See Duncan, supra; Bindschusz, supra; Leahy, supra*. Accordingly, we conclude the admission of photographs of Weaver's spec homes was within the trial court's discretion, and the Griffiths are not entitled to a new trial on this basis. *See Duncan, supra; Palmosina, supra*.

¶ 37 In its cross-appeals at Nos. 797 WDA 2002 and 798 WDA 2002, PCC raises the following issues:

WHEN THE PARTIES TO THE CONTRACT HAVE AGREED TO THE PAYMENT OF 18% AND THE JURY

---

4. Weaver also admitted that some of the photographs depicted homes he had built.

5. We also note that a general discovery request for all PCC's pictures of the Griffiths' home would not necessarily elicit a response that included pictures of Weaver's homes. The doctrine of unfair surprise is not a remedy for a party's imprecise discovery requests. *See Duncan, supra*.

RETURNED A VERDICT FOR BREACH OF CONTRACT, WAS IT ERROR FOR THE COURT BELOW TO DENY THE PREVAILING PLAINTIFF PRE–JUDGMENT INTEREST AT THE CONTRACT RATE AND WAS IT FURTHER ERROR FOR THE COURT BELOW TO REDUCE POST–JUDGMENT INTEREST TO THE LEGAL RATE OF 6%? MAY A PREVAILING PLAINTIFF IN A CONVERSION ACTION RECOVER ITS ATTORNEY'S FEES IN ORDER TO BE MADE WHOLE? MAY A PREVAILING PLAINTIFF IN A CLAIM FOR INTENTIONAL CONVERSION OF CONSTRUCTION LOAN PROCEEDS RECOVER PUNITIVE DAMAGES? WHEN A JUDGMENT WAS ENTERED AND MODIFIED BY COURT ORDER TWO DAYS LATER AND WHEN AN AGGRIEVED PARTY ONLY APPEALED FROM THE ORDER MODIFYING THAT JUDGMENT, AND WHEN THAT PARTY RAISED ON APPEAL ISSUES PERTAINING TO THE ENTRY OF JUDGMENT BUT NOT THE MODIFICATION OF IT, SHOULD THE APPEAL BE QUASHED?

(PCC's Brief at 5).

█ ¶ 38 As a prefatory matter, we must determine whether PCC's cross-appeals are properly before this Court. Pennsylvania Rules of Appellate Procedure Rule 501 states:

**Rule 501. Any Aggrieved Party May Appeal**

Except where the right of appeal is enlarged by statute, any party who is aggrieved by an appealable order, or a fiduciary whose estate or trust is so aggrieved, may appeal therefrom.

*Note:* Whether or not a party is aggrieved by the action below is a substantive question determined by the effect of the action on the party, etc.

Pa.R.A.P. 501. The traditional rule is that an appellee must file a cross-appeal to raise an issue not raised by the appellant, or risk waiver of that issue. *See Kit v. Mitchell,* 771 A.2d 814 (Pa.Super.2001), *appeal granted in part,* 567 Pa. 762, 790 A.2d 1017 (2001). However, the Pennsylvania Rules of Appellate Procedure Rule 511, as newly amended December 2, 2002, reads:

**Rule 511. Cross Appeals**

The timely filing of an appeal shall extend the time for any other party to cross appeal as set forth in Rules 903(b) (cross appeals), 1113(b) (cross petitions for allowance of appeal) and 1512(a)(2) (cross petitions for review). The discontinuance of an appeal by a party shall not affect the right of any party regardless of whether the parties are adverse.

*Note:* ... An appellee should not be required to file a cross appeal because the Court below ruled against it on an issue, **as long as the judgment granted appellee the relief it sought.** *See Ratti v. Wheeling Pittsburgh Steel Corp.,* 758 A.2d 695 (Pa.Super.2000)[, *appeal denied,* 567 Pa. 715, 785 A.2d 90 (2001) ] and *Hashagen v. Workers' Compensation Appeal Board,* 758 A.2d 276 (Pa. Cmwlth.2000). To the extent that *Saint Thomas Township Board of Supervisors v. Wycko,* 758 A.2d 755 (Pa.Cmwlth. 2000)[, *appeal denied,* 567 Pa. 718, 785 A.2d 92 (2001) ] is in conflict, it is disapproved.

Pa.R.A.P. 511 (emphasis added). There have been no published opinions addressing Rule 511 since it was amended in December 2002.

¶ 39 *Ratti, supra* involved an employee ("Ratti") of a subcontractor ("Mendel Steel"), hired by the general contractor ("P.J.Dick") of a project at Wheeling–

Pittsburgh Steel Corporation plant ("Wheeling–Pitt"). Ratti sued Wheeling–Pitt after being injured in an explosion. Wheeling–Pitt then filed complaints against Mendel Steel and P.J. Dick, alleging negligence and seeking contractual indemnification. Wheeling–Pitt subsequently settled Ratti's claim for $1,150,000. Wheeling–Pitt's negligence and indemnity claims against Mendel Steel and P.J. Dick proceeded to trial. The jury found Wheeling–Pitt 99% grossly negligent and P.J. Dick 1% ordinarily negligent for the explosion. However, in the second phase of the trial, the court ruled that P.J. Dick was required to fully indemnify Wheeling–Pitt for the $1,150,000 Ratti settlement. Mendel Steel was not required to indemnify either Wheeling–Pitt or P.J. Dick. Wheeling–Pitt filed post-trial motions for JNOV/new trial on the gross negligence issue, and also to mold its $1,150,000 verdict against P.J. Dick to include prejudgment interest from the date of settlement with Ratti. All post-trial motions were denied, and judgment was entered. P.J. Dick appealed, and Wheeling–Pitt and Mendel Steel cross-appealed.

¶ 40 On appeal, this Court explained that only an aggrieved party may appeal. *Id.* at 700 (citing Pa.R.A.P. 501). The Court defined "aggrieved party" as one who has been adversely affected by the decision from which the appeal is taken. *Id.* (citing *Green v. SEPTA*, 380 Pa.Super. 268, 551 A.2d 578 (1988)). Thus, this Court reasoned, "A prevailing party is not 'aggrieved' and therefore, does not have standing to appeal an order that has been entered in his or her favor." *Ratti, supra* at 700. Because the trial court concluded Mendel Steel was not liable for indemnity to either Wheeling–Pitt or P.J. Dick, Mendel Steel as a prevailing party was not "aggrieved" within the meaning of Rule 501. *Id.* Consequently, this Court quashed Mendel Steel's cross-appeal.

However, this Court did not quash Wheeling–Pitt's cross-appeal. Because Wheeling–Pitt had been found grossly negligent, it was not the prevailing party even though it was entitled to be indemnified by P.J. Dick. *Id.* at 705.

¶ 41 This Court has also explored the definition of "prevail" within the context of an employment contract. *Profit Wize Marketing v. Wiest*, 812 A.2d 1270 (Pa.Super.2002). In *Profit Wize*, this Court noted that the commonly accepted definition of "prevailing party" is "a party in whose favor a judgment is rendered, regardless of the amount of damages awarded." *Id.* at 1275 (holding there is no "prevailing party" where parties reach settlement). However, *Profit Wize* did not analyze the definition of "prevailing party" in the context of whether a party is aggrieved for purposes of appeal.

¶ 42 In the present case, PCC was the prevailing party in that it received a $136,684.74 verdict against the Griffiths, who were awarded nothing on their counterclaim. However, PCC's award did not include the 18% interest for late payment included in the construction contract. Although PCC petitioned to modify its award according to the terms of the contract, the trial court did not timely address this issue within 120 days of the filing of PCC's first post-trial motion. Despite the fact that PCC "prevailed" in the strict sense of the award, we conclude it was nevertheless aggrieved because it did not receive the interest on the award that it sought under the construction contract. *See* Pa.R.A.P. 501. Under these circumstances, the prevailing party was aggrieved by a judgment that did not grant it the full contractual relief it sought.

¶ 43 *Ratti* is distinguishable from the instant case. In *Ratti*, the court found Mendel Steel not liable in negligence to

Ratti and not liable under an indemnity theory to Wheeling–Pitt. Thus, as a defendant to the actions of Ratti and Wheeling–Pitt, Mendel Steel received the complete relief it sought; *i.e.* it avoided liability completely. Here, the judgment in favor of PCC, the plaintiff, did not include pre-judgment interest, let alone the contractual 18% interest, from the date the Griffiths' began wrongfully withholding payment. Thus, unlike Mendel–Steel, PCC received only a portion of the relief it sought against the Griffiths. Consistent with Rule 501, which permits **any** aggrieved party to appeal, and Rule 511, which allows a cross-appeal from a party who **did not receive the relief it sought,** PCC properly cross-appealed from the judgment in this case, even though the judgment favored PCC. *See* Pa.R.A.P. 501, 511. Accordingly, we now address the merits of PCC's cross-appeals.

¶ 44 PCC's first argument on cross-appeal centers on the trial court's failure to mold the judgment to reflect the 18% interest rate that the parties agreed to in the construction contract. PCC correctly sets forth that parties to a contract, in anticipation of litigation, may stipulate to an interest rate that is higher than the statutory rate of 6%. PCC argues that the interest rate issue was not submitted to the jury, but was submitted to the court after the trial *via* a motion to mold the verdict. The issue was never addressed by the trial court because PCC *praeciped* for entry of judgment pursuant to Pennsylvania Rule of Civil Procedure Rule 227.4(1)(b).[6] PCC then unilaterally entered judgment for an amount that included the 18% prejudgment interest. However, before PCC could execute on the

judgment, the Griffiths filed, *inter alia,* an emergency motion to stay execution, and the motions court reduced the entry of judgment to the full verdict figure plus 6% post-judgment interest only. PCC believes the motions court had no authority to modify the judgment amount entered pursuant to Rule 227.4(1)(b). Thus, PCC concludes the court erred when it modified the judgment. We agree in part.

¶ 45 In contract cases, statutory prejudgment interest is awardable as of right. *Daset Min. Corp. v. Industrial Fuels Corp.,* 326 Pa.Super. 14, 473 A.2d 584, 595 (1984). "In claims that arise out of a contractual right, interest has been allowed at the legal rate from the date that payment was wrongfully withheld, where the damages are liquidated and certain, and the interest is readily ascertainable through computation." *Id.* Interest must be awarded notwithstanding the good faith of the party contesting the claim. *Metropolitan Edison Co. v. Old Home Manor, Inc.,* 334 Pa.Super. 25, 482 A.2d 1062, 1064 (1984). The statutory rate of interest in this Commonwealth is fixed at 6%. 41 P.S. § 202; *Daset, supra* at 594. However, in anticipation of non-payment of money due, parties to a contract may stipulate to a higher rate of prejudgment interest. *Reliance Security Service, Inc. v. 2601 Realty Corp.,* 383 Pa.Super. 608, 557 A.2d 418, 419 (1989); *Daset, supra* at 595.

¶ 46 Similarly, a plaintiff is entitled to interest on a judgment for a specific sum of money from the date of the verdict. 42 Pa.C.S.A. § 8101; *Osial v. Cook,* 803 A.2d 209, 215 (Pa.Super.2002). Statutory post-judgment interest "is a matter of right where damages are ascertainable by computation, even though a

---

6. Rule 227.4(1)(b) instructs that upon *praecipe* of a party, the prothonotary shall enter judgment upon a jury verdict if one or more timely post-trial motions are filed and the trial court does not enter an order disposing of all orders within 120 days after the filing of the first motion. Pa.R.C.P. 227.4(1)(b).

*bona fide* dispute exists to the amount of the indebtedness." *Id.* Again, the statutory rate of interest in the Commonwealth is fixed at 6%, but parties to a contract may agree to a higher rate. 41 P.S. § 202; *In re Estate of Braun,* 437 Pa.Super. 372, 650 A.2d 73, 78 (1994).

¶ 47 A trial court may mold a jury verdict to include interest owed, even when the issue is not submitted to the jury. *See Metropolitan, supra* at 1065; *Thomas v. Allegheny & Eastern Coal Co.,* 309 Pa.Super. 333, 455 A.2d 637, 641 (1982); *Com. to Use of Walters Tire Service, Inc. v. National Union Fire Ins. Co.,* 434 Pa. 235, 242, 252 A.2d 593, 596 (1969). This Court also has the authority to mold the verdict by adding interest that is due. *See Berkeley Inn, Inc. v. Centennial Insurance Company,* 282 Pa.Super. 207, 422 A.2d 1078 (1980). Moreover, a trial court may mold a verdict to include prejudgment interest even after an appeal has been taken. *Metropolitan, supra* at 1065. *See also* Pa.R.A.P. 1701(b)(1).

¶ 48 In *Metropolitan,* Metropolitan Edison Company ("Met–Ed") won a breach of contract claim against the appellant/defendant. *Id.* at 1062. Met–Ed entered judgment for the verdict amount plus 6% prejudgment interest, but the parties later consented to strike the judgment because all of the appellant's post-trial motions had not been resolved. *Id.* at 1063. When the appellant's post-trial motions were finally dismissed, the court entered judgment without adding the prejudgment interest. *Id.* Met–Ed filed a petition for correction of judgment with the trial court, but not before the appellant had filed its notice of appeal. *Id.* This Court held:

> Ordinarily, a lower court is divested of its jurisdiction during the pendency of

an appeal. However, in *Fish v. Gosnell,* [316 Pa.Super. 565, 463 A.2d 1042, 1052 (1983) ] we held that the court did not err in modifying a verdict to reflect preaward interest under Pa.R.C.P. 236, even though it was done beyond the thirtieth day after entry of judgment, since the modification was a permissible correction to a formal error in the court's papers. Although the addition of delay damages under Rule 238 applies only to tort cases, not contract cases, addition of prejudgment interest in a contract case, like addition of delay damages under Rule 238, is a matter of legal right. Computation of interest is a simple clerical matter based upon dates and amounts appearing on the face of the record.

*Id.* at 1065 (internal quotation marks and citations omitted). Thus, this Court held the trial court properly added prejudgment interest to the verdict despite the fact that an appeal had already been taken.[7] *Id.*

¶ 49 Instantly, the construction contract reads, in pertinent part:

> If any payments, as specified in this Agreement, are withheld, without cause, by the [Griffiths], the [Griffiths] will pay additional fees of 18% **per year** on the outstanding balance, and that the warranty will be void **until all monies are paid.**
>
> * * *
>
> The [Griffiths] shall not occupy or attempt to occupy the dwelling house until final payment covering the contract price as specified in this Agreement, are made to [PCC] in accordance with the terms of this agreement.

---

**7.** We also note the question of prejudgment interest was not submitted to the jury in *Met-* *ropolitan.*

* * *

In the event the owner shall fail without cause, to make full and final settlement as specified in this Agreement covering the aforesaid dwelling upon completion, said completion being more fully set forth in paragraph nine above, [the Griffiths] shall be liable for taxes and insurance occurring thereafter and such final payment and/or all other unpaid sums due [PCC] shall bear interest at the rate of **18% per annum from the date such final was due until paid**.

Agreement for Construction of a Dwelling in the Summerlawn Plan of Lots, at 2, 4 (emphasis added).

¶ 50 The jury awarded PCC $111,684.74 on its breach of contract claim and $25,000 on its conversion claim, for a total award of $136,684.74. On April 8, 2002, PCC *praeciped* for entry of judgment pursuant to Rule 227.4(1)(b). *See* Pa.R.C.P. 227.4(1)(b). The judgment entered by PCC was for $178,912.88, which PCC calculated by adding an 18% prejudgment interest rate to the full $136,684.74 verdict. On April 10, 2002, motions court modified this verdict to $139,718.19, consisting of the full $136,684.74 verdict plus 6% **post**-judgment interest. Motions court reasoned that PCC had no authority to modify the verdict to reflect the contractual interest rate without the trial court's approval. Motions court also indicated it had no knowledge of the case save for what it had gleaned from the docket. The Griffiths filed their notice of appeal on May 7, 2002.

¶ 51 The procedural history in the instant matter is analogous to *Metropolitan*, but *Metropolitan* is not dispositive. In *Metropolitan*, the court was only asked to apply prejudgment interest at the legal rate of 6%, which Met–Ed was entitled to as a matter of law. *See id.* Here, PCC certainly has a lawful right to the statutory 6% prejudgment interest. Its claim for 18% prejudgment interest, however, is contractually based. However, PCC entered judgment pursuant to Rule 227.4(1)(b) before the trial court reviewed PCC's petition to mold the verdict. Under these circumstances, PCC should not have molded the verdict unilaterally to include 18% prejudgment interest on the verdict.

¶ 52 The Griffiths petitioned motions court for relief before PCC could execute on the judgment. Specifically, the Griffiths filed emergency motions to strike judgment, stay execution and to set aside writ of execution. Although the motions court was generally reluctant to modify the verdict, it nevertheless reduced the judgment entered by PCC from $178,912.88 to the full verdict amount of $136,684.74 plus 6% post-judgment interest. In *Metropolitan*, the modification to include the legal interest rate was based on the exception to Pennsylvania Rule of Appellate Procedure Rule 1701(b)(1), which allows a trial court to correct formal errors even after it is divested of authority pursuant to the filing of an appeal. *See id.*; Pa.R.A.P. 1701 *et seq.* Here, motions court had been divested of its authority pursuant to Pennsylvania Rule of Civil Procedure Rule 227.4(1)(b), which states "a judgment entered pursuant to this subparagraph shall be final as to all parties and issues and shall not be subject to reconsideration." *See* Pa.R.C.P. 227.4(1)(b). There is no list of exceptions to Rule 227.4(1)(b). *See id. See also Conte, supra* at 231 (stating "it is equally clear that the judgment [entered under Rule 227.4(1)(b) ] is not subject to either reconsideration **or any other motion to strike, open or vacate**") (emphasis added). Moreover, neither PCC nor the Griffiths had yet filed a notice of appeal when the motions court modified the judgment on April 10, 2002. Thus, Rule 227.4(1)(b), not Rule 1701, governed because Rule 1701 had not been

triggered at the time of the court's modification. Under the broad language of Rule 227.4(1)(b), after judgment was entered on April 10th, all issues, including those related to rights as a matter of law, were no longer subject to reconsideration by the court. *See Conte, supra.* In conclusion, we hold that under these circumstances, where PCC *praeciped* for entry of judgment pursuant to Rule 227.4(1)(b), neither PCC nor motions court had authority to modify or even reconsider the original verdict of $136,684.74. Any dispute regarding the addition to the judgment of a statutory or contractual rate of interest should have been left for appellate review.

▇▇▇▇ ¶ 53 Nevertheless, the issue of what rate of interest to apply in this case has been properly preserved for our review. *See Berkeley Inn, Inc., supra.* We now examine this issue. PCC is entitled to prejudgment and post-judgment interest at least at the statutory rate of 6%, regardless of whether the issue was submitted to the jury. *See Metropolitan, supra; Thomas supra; Walters Tire Service, Inc., supra.* However, the plain language of the contract indicates that if the Griffiths failed to make full payment under the contract without cause, PCC would be entitled to interest at a rate of 18% from the date payment became due until the date PCC receives payment. The parties were free to stipulate to this higher interest rate. *See In re Estate of Braun, supra; Reliance Security Service, Inc., supra.* The jury determined the Griffiths did withhold payment in breach of their contract. The fact that the amount of money owed was contested by the Griffiths in good faith does not affect PCC's entitlement to the contractual interest rate. *See Osial, supra; Metropolitan, supra.* The contract's explicit language—"shall bear interest at the ·rate of 18% per annum **from the date such final was due until**

**paid**"—indicates the parties intended this increased rate to apply to both prejudgment and post-judgment interest calculations.

¶ 54 The Griffiths withheld two draw payments, the "exterior" and "final" draws. The "exterior" draw became due under the contract on March 2nd, 2000, when Dollar Bank's inspector reported the exterior of the home was 99% complete and recommended dispersal of that draw. (N.T. Trial, 11/19/01, at 302–03). The final draw became due no later than April 17, 2000, when the Griffiths took possession of their home. Thus, we remand for recalculation of the interest on the $111,684.74 award on PCC's breach of contract claim. The court is instructed to add an 18% prejudgment interest rate calculated from March 2, 2000 for the funds associated with the "exterior" draw, and from April 17, 2000 for the funds associated with the "final" draw. The court is also instructed to apply an 18% post-judgment interest rate to the verdict on the contract claim until payment is satisfied.

¶ 55 In PCC's remaining two claims, it urges this Court to add punitive damages and attorney's fees to its conversion award. Because we have held that the conversion count should not have been submitted to the jury, we need not address these claims.

¶ 56 Based on the foregoing analysis, we hold the jury's verdict in favor of PCC on its breach of contract claim was not against the sufficiency or weight of the evidence. Additionally, we conclude the trial court should not have submitted the conversion claim to the jury because the "gist of the action" was the contract claim. We also hold that PCC, the prevailing party, was nevertheless aggrieved by the verdict, which did not award the interest PCC sought under the construction contract. Thus, PCC was entitled to cross-

appeal from the judgment as an aggrieved party. We further hold that the contractual interest rate of 18% should apply to PCC's breach of contract judgment, rather than the statutory rate of 6%. Thus, after careful review of all issues raised by the parties, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

¶ 57 Judgment affirmed in part and reversed in part; case remanded for further proceedings. Jurisdiction is relinquished.

¶ 58 Judge TODD filed a concurring and dissenting opinion.

## CONCURRING & DISSENTING OPINION BY TODD, J.:

¶ 1 I join in the Majority's resolution of each of the issues raised by the parties in these cross-appeals with one exception: I cannot agree that PCC is entitled to 18% pre- and post-judgment interest. On that issue, I must dissent from the view of my distinguished colleagues.

¶ 2 Two provisions of the construction agreement at issue provide that PCC is entitled to 18% interest on sums withheld by the Griffiths "without cause". (*See* Agreement for Construction of a Dwelling in the Summerlawn Plan of Lots, 4/24/99, at ¶ IV.B ("If any payments, as specified in this Agreement, are withheld, *without cause,* by the Owner, the Owner will pay additional fees of 18% per year on the outstanding balance, and that the warranty will be void until all monies are paid." (emphasis added))); *id.* at ¶ XII ("In the event the Owner shall fail *without cause,* to make full and final settlement as specified in this Agreement, ... all other unpaid sums due the Contractor shall bear interest at the rate of 18% per annum from the date such final was due until paid." (emphasis added)).

¶ 3 The Majority acknowledges these contractual terms; but concludes that because the jury determined the Griffiths breached the contract by withholding payments, such breach equates to withholding payments *without cause.* (*See* Majority Opinion, at 593.) The Majority adds "[t]he fact that the amount of money owed was contested by the Griffiths in good faith does not affect PCC's entitlement to the contractual interest rate." (*Id.* at 593.) I disagree.

¶ 4 The cases cited by the Majority in support of this conclusion—*Metropolitan Edison Co. v. Old Home Manor, Inc.,* 334 Pa.Super. 25, 482 A.2d 1062 (1984) and *Osial v. Cook,* 803 A.2d 209 (Pa.Super.2002)—are inapposite, as both of those cases concern *statutory* interest, not *contractual* interest. I do not dispute that PCC is entitled to statutory interest, or that good faith conduct is not relevant to the imposition of statutory interest. PCC's entitlement to 18% interest, however, is based solely on the contractual terms agreed upon by the parties. Here, the contract clearly states that PCC is entitled to the 18% rate only where payment is withheld "without cause". I cannot conclude that where the withholding of funds breaches the agreement, that that *necessarily* means the funds are withheld without cause. Indeed, such a conclusion would read the phrase "without cause" out of the agreement, which we are obliged not to do when interpreting a contract. *See, e.g., Meeting House Lane, Ltd. v. Melso,* 427 Pa.Super. 118, 126, 628 A.2d 854, 857–58 (1993) ("One part of a contract cannot be interpreted so as to annul another part, and a contract must be construed, if possible, to give effect to all of its terms."). Further, the Majority's conclusion that the Griffiths contested the amounts due in good faith at least raises an issue of whether they had cause for doing so.

¶ 5 Accordingly, I believe it was a jury question whether the Griffiths withheld funds due under the contract without cause so as to trigger the 18% interest rate. *Cf. Shared Communications Serv. of 1800–80 JFK Blvd. Inc. v. Bell Atlantic Prop. Inc.*, 692 A.2d 570, 577 (Pa.Super.1997) (sufficient evidence was proffered to allow the jury to determine the proper contract rate of interest). As this issue was not presented to the jury, I would find that PCC has waived its entitlement to contractual interest of 18%.

¶ 6 Nonetheless, PCC is entitled to statutory pre- and post-judgment interest of 6%. To this end, I would remand for a calculation of both pre- and post-judgment interest as prescribed by the Majority, but at a rate of 6%.