J-A12039-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| KEITH A. SHAFFER, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| VISAGGIO'S, INC., | |
| Appellant | No. 1959 MDA 2014 |

Appeal from the Order entered October 20, 2014,
in the Court of Common Pleas of Cumberland County,
Civil Division, at No(s): 2009-02122

BEFORE:  BOWES, DONOHUE, and ALLEN, JJ.

MEMORANDUM BY ALLEN, J.:                                **FILED JULY 29, 2015**

Visaggio's, Inc., ("Appellant"), appeals from the trial court's order adopting the appraiser's report and recommendations regarding the value of Appellant's business and of the 25% share of stock belonging to dissenting stockholder, Keith Shaffer, ("Shaffer").  We affirm.

In its order adopting the report and recommendations from Appraiser William A. Duncan, ("Appraiser Duncan"), the trial court set forth the following background relative to this action:

> [Appellant] was a corporation incorporated under the laws of Pennsylvania in 1980.  At formation, [Appellant] had three shareholders:  Rosemary Lumadue who held 25% of [Appellant's] shares, William Lumadue who held 25% of [Appellant's] shares, [hereinafter "the Lumadues,"] and [Shaffer], who held 50% of [Appellant's] shares.  In 1981, [Shaffer] sold half of his interest in [Appellant] to the Lumadues, thereby resulting in [the Lumadues] holding 37.5% each and [Shaffer] holding 25% of [Appellant].  In 1981, due to disagreements between the Lumadues and [Shaffer], [Shaffer]

ended participation in the business, but retained his 25% ownership interest. The situation remained as it was until 2008, when [Shaffer] was notified of an impending shareholder's meeting to consider a merger of [Appellant] with and into Visaggio's Acquisition, Inc. (Acquisition) [hereinafter collectively "Appellant"]. [Shaffer] received a proxy statement, which he returned indicating that he would be voting against the merger. A meeting was held in 2008 and the merger was approved. Pursuant to 15 Pa.C.S.A. § 1575, a notice was mailed to [Shaffer] informing him that as a dissenting shareholder he is entitled to demand payment for the fair value of his stock. [Shaffer] made such a demand, to which [Appellant] estimated [Shaffer's] ownership interest to have a fair value of $35,000. [Shaffer] refused the offer, believing his shares to be worth $500,000, which was subsequently refused by [Appellant]. [Shaffer] then filed the instant action under 15 Pa.C.S.A. § 1579 on April 17, 2009.

At the time of merger, [Appellant's] real property consisted of 5 acres of land and other improvements such as the restaurant, hotel, garage, and banquet facilities. The hotel was not franchised and lacked various amenities as well as connection to water and sewer services. The restaurant had various pieces of equipment related to the business. An action having been filed under 15 Pa.C.S.A. § 1579, this court appointed the services of a statutorily-permitted appraiser[, Appraiser Duncan,] to conduct the valuation of [Appellant]. Following the filing of cross pre-hearing memoranda, hearings before [Appraiser Duncan], and consideration of post-hearing memoranda, [Appraiser Duncan] filed his report on November 1, 2010. [Shaffer] then filed an appeal from the report of the appraiser, citing both factual and legal errors. [Thereafter, Appellant] filed their exceptions to the report of [Appraiser Duncan], also alleging both factual and legal errors. Subsequently, it was determined that a preliminary objection in the form of insufficient service remained outstanding, raising the question of whether the Court had jurisdiction over the matter. We sustained the preliminary objection.

Following proper service, the parties stipulated that the actions of the Court until that point, assigning an appraiser who held hearings and filed a report, would stand as the record rather than repeat the process which would only further delay the matter and increase costs. In summation, [Appraiser Duncan] has heard the evidence and filed his report and both

parties have filed their exceptions and/or appeal arguing against the adoption of the report. The Court must now determine whether the report should be adopted or, in the alternative, whether it should adopt one of the parties' valuation or its own valuation.

[] [Appraiser Duncan's] findings are exceptionally simple to declare. [Appraiser Duncan] found that [Appellant's] real estate valuation totaled $1,800,000, less a debt of $1,600,000, while the business equipment totaled $325,000. This determination included the following for the real estate valuation, "[t]he hotel rooms and liquor license should be considered but not to the extent promoted by [Shaffer's] appraiser for the reasons presented by the Lumadues [sic] [who highlighted that the comparable sales used by Shaffer's appraiser involved franchised hotels with upgraded amenities and accommodations]." [Appraiser Duncan's Report at 3]. Further, the Appraiser indicated that for the equipment value, "insurance coverages were considered together with the Appraiser's view of the premises. The equipment is used, readily available, not unique and in some cases, very dated." Id. The total valuation of [Appellant] at the time of merger was therefore $525,000, making [Shaffer's] 25% share worth $131,250.

[] Neither party … wishes the Court to adopt [Appraiser Duncan's] Report as it was presented. To that end, [Appellant] continues to maintain that the value of the corporation based on the going concern as of the date of merger was $0 due to the value of the property, standing debt, back pay [of $1,300,000] owed to [the Lumadues] upon demand, and unpaid pension fund for non-shareholder management employees, [John Lumadue and William Lumadue, Jr., hereinafter "the Lumadue children,"] which have not been claimed in approximately three decades]. This would indicate that [Shaffer's] 25% share would also be $0.

[Shaffer], meanwhile, argues that the value of the corporation should either be $799,461 or "between $3,000,000 and $5,000,000" based on admissions by a representative of [Appellant]. ([Shaffer's Exceptions] at 2). This would provide [Shaffer's] 25% share as either $199,865 or $750,000 to $1,250,000, respectively.

[] [Appellant] additionally claims that [Appraiser Duncan] failed to consider both the pension fund and back pay. However, [Appraiser Duncan] noted that the back pay did not appear

- 3 -

under [Appellant's] reports until 2007, only one year prior to the merger proposal. Obviously the Appraiser considered this evidence; however it is equally clear that he did not believe it to be substantial enough to integrate into his calculations.

[Appraiser Duncan] stated he used the insurance values as the basis and then his own observations that the equipment was "used, readily available, not unique and in some cases, very dated," to reduce the value appropriately. We are satisfied that the value of the restaurant equipment is based on competent evidence.

In the alternative, [Shaffer] is asserting that the Appraiser failed to properly accept [Appellant's] admission that the business is worth between $3,000,000 and $5,000,000. [Shaffer] would have us determine the value of a company based on the wishful thinking of the president of the corporation to the exclusion of all of the testimony provided by both parties' expert witnesses and [Appraiser Duncan's] conclusion. We will not do so. Instead, we note that the conclusions of [Appraiser Duncan] bear a reasonable relationship to the values established by the parties' experts and is clearly supported by substantial evidence.

For the foregoing reasons, [Appraiser Duncan's] Report is adopted. The value of [Appellant] at the time of merger is deemed to be $525,000, with [Shaffer's] 25% interest having a value of $131,250.

Trial Court Opinion, 10/20/14, at 1-7 (some citations to the record omitted).

Appellant timely appealed from the trial court's order adopting Appraiser Duncan's report and recommendations. The trial court did not direct compliance with Pa.R.A.P. 1925.

Appellant presents two issues for our review:

A. Did the trial court err by adopting [Appraiser Duncan's] Report without substantial evidence, where [Appraiser Duncan's] conclusion that [Appellant's] business equipment had a value of $325,000 was unsupported by the record?

B. Did the trial court err by adopting [Appraiser Duncan's] Report without substantial evidence, where [Appraiser Duncan's] failure to consider the authorized but unpaid wages to [the Lumadues] and the unfunded pension obligation to [the Lumadue children] was unsupported by the record?

Appellant's Brief at 2. Appellant's issues concern the trial court's adoption of Appraiser Duncan's report and recommendations. We will address them together.

In Pennsylvania, under 15 Pa.C.S.A. § 1579, a stockholder dissenting to a merger may demand a valuation of the fair value of his share of stocks at the time of the merger as follows:

**§ 1579. Valuation proceedings generally**

**(a) General rule.--**Within 60 days after the latest of:

(1) effectuation of the proposed corporate action;

(2) timely receipt of any demands for payment under section 1575 (relating to notice to demand payment); or

(3) timely receipt of any estimates pursuant to section 1578 (relating to estimate by dissenter of fair value of shares); if any demands for payment remain unsettled, the business corporation may file in court an application for relief requesting that the fair value of the shares be determined by the court.

**(b) Mandatory joinder of dissenters.--**All dissenters, wherever residing, whose demands have not been settled shall be made parties to the proceeding as in an action against their shares. A copy of the application shall be served on each such dissenter. If a dissenter is a nonresident, the copy may be served on him in the manner provided or prescribed by or pursuant to 42 Pa.C.S. Ch. 53 (relating to bases of jurisdiction and interstate and international procedure).

**(c) Jurisdiction of the court.--The jurisdiction of the court shall be plenary and exclusive. The court may appoint an appraiser to receive evidence and recommend a decision on the issue of fair value. The appraiser shall have such**

**power and authority as may be specified in the order of appointment or in any amendment thereof.**

**(d) Measure of recovery.--Each dissenter who is made a party shall be entitled to recover the amount by which the fair value of his shares is found to exceed the amount, if any, previously remitted, plus interest**.

**(e) Effect of corporation's failure to file application.--**If the corporation fails to file an application as provided in subsection (a), any dissenter who made a demand and who has not already settled his claim against the corporation may do so in the name of the corporation at any time within 30 days after the expiration of the 60-day period.  If a dissenter does not file an application within the 30-day period, each dissenter entitled to file an application shall be paid the corporation's estimate of the fair value of the shares and no more, and may bring an action to recover any amount not previously remitted.

15 Pa.C.S.A. § 1579 (a) – (e) (emphasis supplied).

In deciding whether to accept an appraiser's report and recommendations regarding the value of a dissenting stockholder's stocks pursuant to 15 Pa.C.S.A. § 1579, a trial court must preliminarily find that the appraiser's report and recommendations are supported by competent and substantial evidence, and having found that it is, a trial court's adoption of an appraiser's report and recommendations will not be disturbed absent an abuse of discretion.  ***In re Watt & Shand,*** 304 A.2d 694, 697 (Pa. 1973).

We have observed that "substantial evidence is more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***In re Glosser Bros., Inc.,*** 555 A.2d 129, 132 (Pa. Super. 1989) (internal citation omitted).  In "reject[ing] [an]

appellant's request that we make an independent determination as to the fair value of her shares," we have reiterated that "'[t]his [C]ourt does not sit as a trier of issues of fact expecting to be persuaded that one or the other side is more credible. That is only a task for the trial court and we would never invade that area of the judicial process.'" ***Id. citing Appeal of Connor,*** 283 A.2d 279, 280 (Pa. 1971).

Instantly, Appellant maintains that the trial court erred in adopting Appraiser Duncan's recommendation that Appellant's business equipment had a value of $325,000 dollars rather than the zero value which Appellant had ascribed to the business equipment. Appellant posits that "[Appraiser] Duncan's view of the Property (like the information on insurance coverage) was not and could not be a part of the record in this matter, as it occurred almost two months after the record closed and was not a basis to value that equipment." Appellant's Brief at 17 (emphasis in original omitted). We disagree.

Initially, we find that Appellant waived this claim of error by failing to object, at the earliest opportunity, to Appraiser Duncan's request for a site visit and for Appellant's insurance policies. We have explained:

> Our Supreme Court has frequently stressed the necessity of raising claims **at the earliest opportunity**, i.e., during the trial or hearing, so that alleged errors can be corrected promptly, thus eliminating the possibility that an appellate court will be required to expend time and energy reviewing claims on which no trial ruling has been made.
>
> *Mazlo v. Kaufman,* 93 A.2d 968, 969 (Pa. Super. 2002). Thus, as a general rule, assuming there is an opportunity to do so,

claims that have not been raised during trial may not be raised for the first time on appeal. *Id.* *See also Jahanshahi v. Centura Development Co., Inc.,* 816 A.2d 1179, 1189 (Pa. Super. 2003) (stating same).

**Wilson v. Transport Corporation,** 889 A.2d at 568, 573 (Pa. Super. 2005) (emphasis in original).

On June 1, 2009, the trial court ordered the appointment of Appraiser Duncan to hear Shaffer's petition, an appointment which received no objection from either party. **See** Order, 6/1/09, at 1. The lack of objection was not surprising, given Appraiser Duncan's noted familiarity with various expert witnesses in the case, such that he indicated that "qualifying certain witnesses in detail will not be necessary." N.T., 1/13/10, at 5 and 56; N.T., 6/4/10, at 305. Appraiser Duncan expressed that he had "been involved with various businesses," was the "chair of the [B]oard of [R]eview for [Cumberland] [C]ounty," and "usually … serves as an auditor." N.T., 1/13/10, at 22 and 56; N.T., 6/4/10, at 305. Appraiser Duncan observed that "most auditors in Cumberland County kind of follow my format" in preparing reports. N.T., 6/4/10, at 305.

Appraiser Duncan heard testimony on January 13-14, 2010, and on June 4, 2010. On July 7, 2010, Appraiser Duncan scheduled an inspection of Appellant's business. On July 27, 2010, Appraiser Duncan viewed Appellant's business in the presence of all counsel. The record is wholly devoid of any evidence that Appellant's counsel ever objected to Appraiser Duncan's request for a site visit or for Appellant's insurance policies

contemporaneously with these events. Likewise, at the time of the foregoing requests and events, Appellant's counsel failed to assert that Appraiser Duncan's requests were impermissibly *dehors* a closed record. Indeed, Appellant does not cite to any document setting forth such a timely objection seeking to thwart Appraiser Duncan's visit or his receipt of the insurance policies. While Appellant asserts that he "raised and preserved the issue" of Appraiser Duncan's "incorrect valuation of [Appellant's] equipment" in its November 30, 2010 Exceptions to the Report of Appraiser, (Appellant's Brief at 10), Appellant disregards that this challenge was raised four months following the foregoing requests, which was not Appellant's earliest opportunity to object. Appellant's failure to object at the earliest opportunity effects waiver of this claim of error.

Even absent waiver, we reject Appellant's contention that the record was closed when Appraiser Duncan visited Appellant, or when he requested and reviewed Appellant's insurance coverage. Appraiser Duncan specifically advised the parties at the beginning of the multi-day proceedings, that he would continue to review the materials regarding the action following the conclusion of oral testimony. N.T., 1/13/10, at 9 ("I was appointed in June [2009] and because of lengthy discovery I haven't finished my job yet, but I'd like to conclude it as quickly as possible."). After testimony concluded on June 4, 2010, Appraiser Duncan reiterated the active status of the action following the hearing. Specifically, he advised the parties, "I can tell you from listening to the testimony that each side is well lawyered but that the

conclusion will not be what you are seeking and the conclusion will not be what you're offering, but beyond that I will continue to review these statements and financials." N.T., 6/4/14, at 398. Consonant with Appraiser Duncan's ongoing review, within weeks of the June 4, 2010 proceedings, Appraiser Duncan requested, and without objection conducted, a visit to Appellant in the presence of all counsel, following which he requested, and likewise received without protestation, Appellant's insurance policies. In fact, Appraiser Duncan observed that the "value provided to the casualty insurer of … $642,000 for [Appellant's] business personal property," was within "the insurance documents **submitted post-hearing**," rather than *dehors* the record. Appraiser Duncan's Report, 11/1/10, at 13 (emphasis supplied). Accordingly, we reject Appellant's contention that the evidentiary record was closed, such that Appraiser Duncan's visit to Appellant, and his request, receipt, and review of Appellant's insurance policies was *dehors* the record.

Additionally, we are mindful that the trial court's adoption of Appraiser Duncan's report and recommendations arising from the foregoing evidence falls within the trial court's sound discretion as the ultimate arbiter of the admissibility of evidence. We have expressed:

> When we review a trial court's ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. *Spino, supra* at 734 (*citing Rogers v. Johnson & Johnson Products, Inc.,* 401 Pa.Super. 430, 585 A.2d 1004, 1007 (1990)). In addition, for a ruling on evidence to constitute

reversible error, it must have been harmful or prejudicial to the complaining party. *Aldridge v. Edmunds,* 561 Pa. 323, 333, 750 A.2d 292, 298 (2000); *Pittsburgh Construction Co. v. Griffith,* 834 A.2d 572, 585 (Pa. Super. 2003), *appeal denied,* 578 Pa. 701, 852 A.2d 313 (2004); *Spino, supra* at 735.

***Hutchinson v. Penske Truck Leasing Co.,*** 876 A.2d 978, 984 (Pa. Super.

2005). We have explained:

> Judicial discretion requires action in conformity with law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason. Similarly, the trial court abuses its discretion if it does not follow legal procedure.

*Miller v. Sacred Heart Hosp.,* 753 A.2d 829, 832 (Pa. Super. 2000) (internal citations omitted).

> "Where the discretion exercised by the trial court is challenged on appeal, the party bringing the challenge bears a heavy burden." *Paden v. Baker Concrete Constr., Inc.,* 540 Pa. 409, [412,] 658 A.2d 341, 343 (1995) (citation omitted).

> [I]t is not sufficient to persuade the appellate court that it might have reached a different conclusion if ... charged with the duty imposed on the court below; it is necessary to go further and show an abuse of the discretionary power. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.

> *Id.* (internal quotations and citations omitted).

*Bartlett v. Bradford Publishing, Inc.,* 885 A.2d 562, 566 (Pa. Super. 2005).

*Lineberger v. Wyeth,* 894 A.2d 141, 146 9Pa. Super. 2006) (internal citations omitted).

Moreover, within the context of business valuations, we have observed:

> [Our] Supreme Court instructed that fair value is to be construed as going concern value, as contrasted with liquidation value. The court noted that there is a potentially endless list of factors that are considered relevant to this value. The "going concern" concept of fair value in a dissenting shareholders' appraisal proceeding and the many individual factors comprising it were aptly described by the Delaware Supreme Court in *Tri–Continental Corp. v. Battye,* Del., 74 A.2d 71, 76 (1950):
>
> > The basic concept of value under the appraisal is that the stockholder is entitled to be paid for that which has been taken from him, viz., his proportionate interest in a going concern. By value of the stockholder's proportionate interest in the corporate enterprise is meant the true or intrinsic value of his stock which has been taken by the merger. In determining what figure represents this true or intrinsic value, the appraiser and the courts must take into consideration all factors and elements which might reasonably enter into the fixing of value. Thus, market value, asset value, dividends, earning prospects, the nature of the enterprise and any other facts which were known or which could be ascertained as of the date of the merger and which throw any light on future prospects of the merged corporation are not only pertinent to any inquiry as to the value of the dissenting stockholders' interest, but must be considered by the agency fixing the value.
>
> *Id.* at 72.
>
> [Our Supreme Court] court noted that courts had properly distilled all of these factors into three principal valuation methods, i.e. (1) net asset value; (2) actual market value; and (3) investment value. The court defined these valuation methods as follows:

*Net Asset Value* is the share which the stock represents in the value of the net assets of the corporation. Such assets include every kind of property and value, whether realty or personalty, tangible and intangible, including good will and the corporation's value as a going concern.

*Investment Value* is an estimate of present worth in light of past, present and prospective financial records of the company and is obtained by capitalizing earnings. There are two basic steps in the capitalization process: calculation of a representative annual earnings figure, and choice of a capitalization ratio which reflects the stability and predictability of earnings of the particular corporation.

*Market Value* refers to the price at which the stock was selling on the market prior to the action which is objected to, disregarding any change in price due to the action.

*O'Connor,* 452 Pa. at 292–93 n. 7, 304 A.2d at 698 n. 7.

However, we do not read the *O'Connor* opinion as limiting a trial court to a consideration of only these three valuation methods. *Id.* at 291–92, 304 A.2d at 697–98. Financial analysis has become increasingly complex with the passage of time. New methods of valuing investments have been developed and are generally accepted in the financial community as being reliable. In recognition of this fact, other jurisdictions that previously restricted a trial court to the foregoing three valuation methods have now expanded the types of valuation information that may be considered in a stock valuation proceeding. For example, in *Weinberger v. UOP, Inc.,* 457 A.2d 701 (Del.1983), the Supreme Court of Delaware, known for its expertise in these matters, directed that Delaware courts would no longer be bound to use only the traditional "Delaware block" or weighted average approach to valuation. [] The *Weinberger* court found this approach too restrictive and directed that courts henceforth use a "more liberal approach [which] must include proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court...." *Id.* at 712–13.

**In re Glosser Bros.,** 555 A.2d at 133-134.

Here, the trial court did not err in determining that the evidence on which Appraiser Duncan relied in valuing Appellant's business equipment was competent and substantial. The parties' real estate experts visited Appellant. N.T., 1/13/10, at 62; N.T., 6/4/10, at 346. The condition of the property, including its business equipment, was raised during the proceedings. Significantly, Appellant's own counsel emphasized during his opening statement to Appraiser Duncan that the site's condition was one of "the significant points that I think you're going to hear in the dispute about value." N.T., 1/13/10, at 17. Specifically, Appellant's counsel stated that Appraiser Duncan would "hear a lot about the overall condition of the property. The property is substantially old." *Id.* at 18.

Appraiser Duncan directly questioned Shaffer's real estate valuation expert, Mr. William Rothman, following Mr. Rothman's direct and cross-examination by the parties. *Id.* at 89. Appraiser Duncan confirmed that, in opining that Appellant's real estate had a value of $1,900,000.00, Mr. Rothman had "assigned no value to furniture and fixtures throughout the structures[.]" *Id.* Appraiser Duncan specifically queried, "[s]o if I were to come into these structures, everything vacant, it would be 1.9 [million dollars], no tables, no chairs, no kitchen equipment?" *Id.* Mr. Rothman agreed, and stated, "[r]eal estate only, yes, just the four walls." *Id.* On re-direct examination, Mr. Rothman confirmed that he had not assigned a value to Appellant's "liquor license … furniture, fixtures and equipment" in order "to stay within the same constraints as in a prior appraisal done by

[Appellant's] appraiser." *Id.* at 90-91. While the parties confined their real estate appraisal reports to non-fixtures and non-equipment items, it does not follow based on the jurisprudence above, that Appraiser Duncan, who was tasked to "make a recommendation to the [trial] court as to the value of [Shaffer's] stock," was confined accordingly in evaluating Appellant's business.

Moreover, Appellant's business equipment was an asset listed on Appellant's balance sheets, and was discussed by the parties' accounting experts. Appellant's accountants, Greenwalt & Company, prepared the financial statements which were relied on by Appellant's accounting expert, Mr. William Boles. Greenwalt & Company's Accountant's Report indicated that they had "compiled the accompanying balance sheets of [Appellant] as of December 31, 2008 and 2007." Accountant's Report, 5/19/09, at 1. The enclosed balance sheets for "December 31, 2008 and 2007" listed Appellant's "Assets," and included $505,537 for "Equipment" for 2008 and for 2007, respectively. *Id.* at 2. In the "Summary of Significant Accounting Policies," the Accountant's Report explained that "[p]roperty and equipment are presented at cost, and depreciated on the straight-line method based on the following estimated useful lives … Equipment … 10 to 15 years. Items sold or retired are removed from cost and accumulated depreciation and any resulting gains or losses are recognized in current operations." *Id.* at 8. A March 6, 2008 Accountant's Report enclosed balance sheets for "December

31, 2007 and 2006," and listed Equipment at $505,537 and at $503,913, respectively, for 2007 and 2006.  Accountant's Report, 3/6/08, at 2.

Additionally, in his opening statement, Appellant's counsel remarked that Appraiser Duncan would "hear that in – at the end of 2007 there were some marketable securities held by the company, $111,[747] of marketable securities.  You will also hear that by the date of the merger **those securities had been liquidated and had been rolled into the operations of the company either for equipment** or to continue operations during the economic downturn that was taking place in 2008 of which we are all painfully aware." *Id.* at 19 (emphasis supplied).

Appellant's treatment of the marketable securities was raised by Mr. William Boles, Appellant's accounting expert, in his report, ("Boles' report").  The Boles' report's treatment of the marketable securities was challenged by Shaffer's accounting expert, Mr. James Smeltzer.  *Id.* at 100.  Mr. Smeltzer observed that the Boles' report did not include the $111,747 marketable securities in valuing Appellant.  Mr. Smeltzer testified that "[i]f you look at [Appellant's] December [20]07 financial statements, they indicate that there were investments in the corporation of $111,747.  My conclusion was, looking at the financial statements, that the asset should be added as a nonoperating asset," to Appellant's value.  *Id.*  Mr. Smeltzer explained that "[o]ne of the components in valuation, which is also included in the Boles' report, is that nonoperating assets of a business need to be evaluated if it is not contributing to the profitability of the company."  Mr. Smeltzer testified

that "quite frankly, I think that asset of [$]111,747 at December 31st, 2007 needs to be added to the value of the company to determine not only the operating value of the company but assets that are not involved with the operation, which in my opinion this—investments and securities was that kind of asset." *Id*. at 101.

Mr. Smeltzer further testified that "the [$111,747] was borrowed money. So we know the debt is reflective in the balance sheet. In other words, everybody is taking the debt number out, but if we ignore that asset that's sitting on the books at that particular point in time from a value standpoint, it was assets held for investments, which is what it says on the statement. It clearly should be added – reducing – I look at it as a reduction of the debt outstanding at that time." N.T., 6/4/10, at 393.

Mr. Boles rebutted Mr. Smeltzer's position and testified as follows:

> Well, in my original report, you know, we did consider those numbers[.] And at the time of interview with the Lumadues, we asked a question about those investments and they told us that those funds were there until they could get their renovations and new equipment in place and that they were going to be expended. So I knew that that was really not excess accumulated earnings or any excess asset of any sort.
>
> **In our normal business valuations when we have excess earnings, we carve them out just as Mr. Smeltzer did, and tack them onto the total value, but in this case since we knew that the amounts were required, and from our tour of the property I saw that they were required, you know, in all respects of the business, that I excluded those numbers and that's why I believe Mr. Smeltzer's adjustment [of adding the $111,747 to Appellant's value] is incorrect**.

And as – and subsequently I found out that, by looking at the December 31st, 2008 financial statements, those assets – or the cash and investments were already gone and spent on improvements so that they were no longer in existence at the date of the merger.

*Id*. at 366-367 (emphasis added).   As recognized by the trial court, following Appraiser Duncan's visit to Appellant, Appraiser Duncan found that the equipment was "used, readily available, not unique and in some cases, very dated."  Trial Court Opinion, 10/20/14, at 6-7.  The trial court observed that Appraiser Duncan did not include the $111,747 in Appellant's value, (*id*. at 5), which is consonant with Appellant's treatment of the marketable securities.

Appellant's equipment was further referenced by Mr. Boles in two of the three approaches he used to value Appellant.  Mr. Boles' "valuation efforts" included "the income approach and the market approach," as well as "asset approach."  *Id*. at 352.  In describing the asset approach, Mr. Boles testified:

Mr. Boles:  What we did there was we said, okay, I'm going to – in a company like this let's take the value of the assets in the business or in the corporation and we said, okay, what are the assets.  It's the tangible assets.  The most important tangible assets is [sic] the real estate and we have a real estate appraisal for that.

**We also have the value of the furniture, fixtures, and equipment and inventory and we have that number from the financial statements of the business.**  And on top of that we said what are the other assets of the business and we said, well, there is – you know, this is an ongoing concern.  There should be some goodwill involved there, some entity or organization goodwill.

And we did a calculation of that and added those factors up and came up to a value before all the other – the deferred compensation [of the Lumadue children] and before the authorized but unpaid compensation [of the Lumadues,] of 191,555, but after application of [the deferred compensation and authorized and unpaid compensation] — the net value was zero.

*Id.* at 353 (emphasis added).

As recognized by Mr. Smeltzer, the Boles' report referenced Appellant's business equipment in the market approach valuation method, prior to applying the unpaid wage claims to ultimately reduce Appellant's value to zero. Mr. Smoltzer explained that in using the market approach valuation method, Mr. Boles "t[ook] the weighted average of revenue, sales[.]" N.T., 1/13/10, at 105. Mr. Boles "refer[red] to Pratt's stats[,] which is an analysis of sales transactions[,] and conclude[d] that … 34 percent of gross sales is an indicator of what a restaurant operation's value would be, which would include the operating assets, which is property—**which is equipment plus any goodwill** and conclude[d] the value was $487,714 [dollars]." *Id.* at 106 (emphasis supplied). Mr. Smeltzer testified that, as to goodwill, Mr. Boles "came down with a value of about $6,586 for the intangible goodwill in this business." *Id.* at 107.

Appraiser Duncan had a valid and reasonable basis to examine the issue of Appellant's equipment, and substantial and competent record evidence from which to derive the equipment's value. Appellant listed the equipment on its balance sheets. Appellant's counsel in his opening statement, and via Mr. Boles' report and opinion, argued that $111,747 of

marketable securities had been liquidated at least in part for "equipment" and should be omitted from Appellant's value. Appellant's equipment was referenced in some of the methods used to value Appellant. Moreover, Appellant's equipment was listed within Appellant's insurance policies, which we do not find were impermissibly secured from *dehors* a closed record, especially since Appellant failed to object in a timely manner.

We reject Appellant's argument that Appraiser Duncan's impressions from the site visit or from his review of the insurance policies were inadmissible evidence considered in his valuation of Shaffer's stock, and that his consideration of Appellant's insurance policies was "not proper." Appellant's Brief at 16. Appellant's pinpoint citations challenging Appraiser Duncan's consideration of Appellant's insurance policies are contextually inapposite to this scenario concerning the valuation of a dissenting shareholder's stock pursuant to 15 Pa.C.S.A. § 1579. *See* Appellant's Brief at 16-17, **citing Estate of Franklin v. Commissioner of Internal Revenue,** 64 T.C. 752, 768 (U.S. Tax Ct. 1975) and **Kane v. State Farm Fire Ins. & Cas. Co.,** 841 A.2d 1038, 1045 (Pa. Super. 2003). Moreover, a plain reading of the cited portions of the foregoing authorities reflects that they do not stand for Appellant's proposition that it was legally improper for Appraiser Duncan to consider Appellant's insurance policies. *Id.*

By contrast, our Supreme Court has expressed:

> [I]t should be observed that while the term 'fair value' is hardly self-executing in its clarity, the object of an appraisal proceeding is to determine the value of the dissenter's shares on

a going concern basis. **In determining what figure represents this true or intrinsic value, consideration must be given to all factors and elements which reasonably might enter into the fixing of value**.

*In re Watt,* 304 A.2d at 697-698 (internal citations and footnote omitted) (emphasis supplied); *see also In re Glosser Bros.,* 555 A.2d at 139 (affirming the trial court's admission of challenged expert testimony, and recognizing that "particularly … in the context of a valuation proceeding[,] the [trial] court needs a broad variety of information relating to the true value of the stock at issue"). Likewise, we have determined:

> "For evidence to be admissible, it must be competent and relevant. Evidence is competent if it is material to the issue to be determined at trial. Evidence is relevant if it tends to prove or disprove a material fact." *American Future Systems, Inc. v. BBB,* 872 A.2d 1202, 1212 (Pa. Super. 2005). *See* Pa.R.E., Rule 401 ("Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.") "Relevant evidence is admissible if its probative value outweighs its prejudicial impact. The trial court's rulings regarding the relevancy of evidence will not be overturned absent an abuse of discretion." *American Future Systems, Inc.,* 872 A.2d at 1212. "A party suffers prejudice when the trial court's error could have affected the verdict." *Gaudio v. Ford Motor Co.,* 976 A.2d 524, 535 (Pa. Super. 2009).
>
> ***
>
> We reiterate that a trial court has broad discretion with regard to the admissibility of evidence, and is not required to exclude all evidence that may be detrimental to a party's case. *See Pittsburgh Const. Co. v. Griffith,* 834 A.2d 572, 585 (Pa. Super. 2003). Such rulings on the admission of evidence will not be overturned by this Court absent a conclusion that the law has been overridden or misapplied, or the judgment exercised is

manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record. *Stumpf [v. Nye,* 950 A.2d 1032-1035-1036 (Pa. Super. 2008)]*.*

*Schuenemann v. Dreemz, LLC,* 34 A.3d 94, 101 (Pa. Super. 2011).

Here, based on our review of the record, we find that the evidence adduced by Appraiser Duncan was relevant, admissible, competent and substantial. We therefore agree with the trial court's determination that "the conclusions of [Appraiser Duncan] bear a reasonable relationship to the value established by the parties' experts and is clearly supported by substantial evidence." Trial Court Opinion, 10/20/14, at 7. We further concur with the trial court's observation that "we need not conclude that [Appraiser Duncan] was correct to a mathematical certainty. Instead, the only determination that needs to be made is whether [Appraiser Duncan's] Report is supported by substantial and competent evidence[.]" *Id.* at 5. Finding that it is, we affirm the trial court's order adopting Appraiser Duncan's report and recommendations valuing Appellant's business equipment at $325,000.

Appellant further argues:

> In determining [Appellant's] share value, [Appraiser] Duncan refused to consider the unpaid wages due and owing to [the Lumadues]. [Appellant's] financial statements specifically state that the corporation owes the Lumadues approximately $1,300,000 in [accrued but] unpaid wages. [Shaffer] bore the burden of proving the salaries were unreasonable, but he offered no evidence or reason why the salaries were unreasonable. Therefore, [Shaffer] failed as a matter of law to carry his burden of proof, and [Appraiser] Duncan's failure to include the authorized but unpaid wages in his determination of the value of [Shaffer's] shares was not supported by competent and

- 22 -

substantial evidence. The trial court erred in adopting [Appraiser Duncan's] report in this respect.

[Appraiser] Duncan also refused to consider [Appellant's] unfunded pension obligation in his determination of [Appellant's] share value. The evidence established that as of the November 5, 2008 merger date, [Appellant] had a $560,000 unfunded pension obligation to its non-shareholder management employees, John Lumadue and William Lumadue, Jr., [the Lumadue children]. The unfunded pension obligation is a legal obligation of [Appellant] and it must be included in the valuation. [Shaffer's] business valuation expert did not disagree that this obligation has to be considered in valuing the stock. [Appraiser] Duncan's refusal to consider the pension obligation was contrary to law and the uncontradicted evidence. The trial court should not have adopted [Appraiser Duncan's] report in this respect.

Appellant's Brief at 12-13. Based on our review of the record, we disagree.

Appraiser Duncan directly examined Mr. Boles as follows:

Appraiser Duncan: Now you've talked about this accrued liability of salaries [for the Lumadues] and the unfunded and unqualified benefit to [the Lumadue children] which totals close to $1.8 million, is that correct?

Mr. Boles: That's right.

Appraiser Duncan: Now, if you were advising either the owners or the employees as to the probability that they would get this money with the current operating condition of the company, what would you advise them?

Mr. Boles: Well, in my experience I've found that we don't know what real estate values are going to go. We don't know, you know, what is going to happen with the business. And based upon that, I would say that for their own personal planning I would discount those numbers substantially.

Appraiser Duncan: You wouldn't count on them, would you?

Mr. Boles: No, I would not.

N.T., 6/4/10, at 367-368.

Mr. Boles acknowledged on cross-examination that the financial statements that he relied upon in valuing Appellant's business "were not" audited financial statements. *Id.* at 369. Mr. Boles confirmed that "in the doing the financial statements, the accountant [who prepared the financial statements] compiled information that was from the representation of management[.]" *Id.* at 370. Mr. Boles further confirmed that "in [his] valuation process [he] did not turn back the clock and do any audited financial statements[,]" and that "for a large part of [his] appraisal and valuation process [he] has relied on the statement of management[.]" *Id.*

Mr. Boles acknowledged that he did not "include [his conclusion of the unfunded, nonqualified deferred compensation claim of the Lumadue children] in the schedules" of his original report. *Id.* at 373. He conceded that either "in 2007 or 2006 … somewhere in the more recent years", was "the first time that the authorized but unpaid salaries [for the Lumadues] were quantified" in Appellant's financial statements. *Id.* at 374. Mr. Boles did not recall "ever seeing the unfunded deferred compensation [for the Lumadue children] quantified in any financial statement." *Id.* Mr. Boles denied that there "exist[ed] money [at the time of the merger] to pay the accrued but unpaid salaries [of the Lumadues.]" *Id.* at 375. He "doubt[ed]" that "[t]he corporation could have borrowed money" to pay the Lumadues "if the Lumadues would have demanded the corporation pay" the accrued but unpaid salaries. *Id.* at 375-376. Mr. Boles further denied that at the time

of the merger "the corporation [was] in a financial position to pay the … deferred compensation" of the Lumadue children. *Id.* at 376.

Mr. Smeltzer opined that the foregoing wage liabilities "are approximately 147 percent higher on the accrued wage schedule than what is reasonable for an operating business of this nature." N.T., 1/13/10, at 119. Mr. Smeltzer concluded that "the salary authorization was higher than market when it was established and quite frankly I think based on the data that I would have done, which is similar to what [Mr.] Boles for reasonable comp[ensation] is, the comp[ensation] that's being accrued currently is well beyond reasonable comp[ensation] levels." *Id.* at 120. Mr. Smeltzer testified that "the fact that we are dealing with an extended period of time here, from 1981 to 2010, a considerable period of time, I think 28, 29 years, I think that overstatement of compensation to a great degree led to that accrual." *Id.* at 121. Mr. Smeltzer further testified that "based on the facts of the [Boles' report] I reviewed, the valuation valuating the reasonable comp[ensation], the accrual of compensation … it appears to me that the accrual is quite frankly excess compensation and not reasonable to be paid by a corporation of this size." *Id.* at 122. Mr. Smeltzer stated that if Appellant "would have been paying that comp[ensation] since 1981, the corporation would have been close to two million dollars in deficit. So those salaries were never – in my opinion there was no expectation of them being paid based on the numbers I've seen." *Id.* Mr. Smeltzer confirmed that he "excluded [the wage claims] from [his] computation" of Appellant's value

"because there was no expectation or there should be no expectation" of the wage claims being paid "because they are excessive[.]" *Id*. at 122-123. Mr. Smeltzer further testified that "the fact that they were excessive based on the analysis [of] the industry led me to the conclusion that the liability was … almost like a freeze out of a minority shareholder, we're going to create a liability that's going to accumulate to a certain number that makes the minority shareholder's value worthless." *Id*. at 123. Mr. Smeltzer opined, "there's no rational reason that the corporation would have entered into that kind of [wage] agreement based on the trend of earnings the company experienced." *Id*.

Accordingly, despite Appellant's contentions to the contrary, there was substantial and competent evidence of record to support Appraiser Duncan's exclusion of the unpaid wage claims for the Lumadues and their children, such that we discern no trial court error in adopting Appraiser Duncan's report and recommendations, which excluded the unpaid wage claims. *See In re Spang Industries, Inc.,* 535 A.2d 86, 90-91 (Pa. Super. 1987) (although remanding for an adjustment to the trial court's computations, the trial court's order was affirmed "in all respects," including where "the [trial] court, within its discretion, drew proper conclusions based on the evidence presented [that] [t]here was more than sufficient evidence to sustain the trial court's conclusion that this was a "squeeze out merger" and that [appellant] was a dynamic going concern which understated its assets and overstated its liabilities in preparation for the merger). We are

mindful that Appellant's argument would require us to impermissibly reweigh the evidence adduced in this action, and to reassess from a cold record the credibility of the witnesses who testified before Appraiser Duncan in favor of, and against, the inclusion of these wage claims in valuing Shaffer's stock. Appellant's argument would have us ignore Appraiser Duncan's conclusion, following the examination of the witnesses and presentation of evidence, that the wage claim was "an obvious attempt to deprive Shaffer as to the value of his Twenty-Five Percent (25%) interest." Appraiser Duncan's Report, 11/1/10, at 15. We cannot do so. ***Brown v. Progressive Insurance Co.***, 860 A.2d 493, 497 (Pa. Super. 2004) (internal citation omitted) ("Concerning questions of credibility and weight accorded evidence at trial, we will not substitute our judgment for that of the finder of fact.").

Discerning no error or abuse of discretion by the trial court, we affirm the trial court's order adopting Appraiser Duncan's report and recommendations.

Order affirmed.

Judge Bowes concurs in the result and Judge Donohue files a Dissenting Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/29/2015