J-A20019-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| MCKESSON CORPORATION, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| GREGORY S. CAMPBELL, WAYFARER AVIATION, INC. F/K/A JDA ACQUISITION COMPANY, INC., ARCADIA AVIATION, ARCADIA AVIATION, LLC, ARCADIA AVIATION, LTD., ARCADIA AVIATION INVESTORS, LLC, ARCADIA AVIATION MANAGERS, LLC, ARCADIA AVIATION IAD, LLC, ARCADIA AVIATION MSV, LLC, ARCADIA AVIATION PHF, LLC ARCADIA AVIATION WEY, LLC, | |
| APPEAL OF: GREGORY S. CAMPBELL, | |
| Appellant | No. 2579 EDA 2014 |

Appeal from the Judgment Entered November 6, 2014
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): October Term, 2010 No. 001732

BEFORE:  DONOHUE, SHOGAN, and WECHT, JJ.

MEMORANDUM BY SHOGAN, J.:                **FILED NOVEMBER 24, 2015**

Appellant, Gregory S. Campbell, appeals from the judgment entered on November 6, 2014, in favor of McKesson Corporation ("McKesson") and against Appellant in the amount of $1,476,584.00.  For the reasons that follow, we reverse and remand.

The trial court summarized the factual history of this case as follows:

> McKesson Corporation ["McKesson"] is a large company, operating primarily in pharmaceuticals.  [McKesson] owned three

corporate jets, and on February 24, 2006 it entered into a contract with TAG Aviation USA, Inc. [("TAG")], an aircraft management company, to provide services designed to keep the corporate jets operating safely and efficiently.

Pursuant to the written contract, [McKesson] deposited $1.8 million dollars, described as an operating fund, with TAG. This amount was estimated to cover about two months['] worth of the funds needed to maintain [McKesson's] planes. The agreement specified that it did not create a principal/agent relationship, but did specify that upon termination of the relationship, TAG was to return any unspent balance of the operating [fund] to [McKesson], whose property it remained.

The contract authorized TAG to pay bills from the operating fund for charges such as fuel expenses and pilot, flight crew and mechanics['] salaries. [TAG] would notify [McKesson] of the expenditures which [McKesson] would review and then reimburse the operating fund in that amount. The operating fund was never segregated into a separate bank account. The contract provided that upon termination or expiration of the contract, TAG was responsible for returning to [McKesson] the remaining operating fund balance less a retention amount which TAG was to apply to cover outstanding aircraft expenses. The arrangement operated satisfactorily to all concerned.

Sentient Flight Group, LLC [("Sentient")] acquired TAG's assets in late 2007 and [McKesson] assigned the TAG aircraft management contract to Sentient on January 22, 2008. [At the time of acquisition, Appellant was the non-executive chairman of Sentient Jet Holdings, LLC, the parent company of Sentient.] By the spring of 2008, the private jet charter business began to feel the adverse effects of the recession. Sentient's board asked [Appellant] to take over as [CEO] which he did, joining the company in September 2008.

[Appellant] has made a career out of buying, reorganizing and reselling businesses. He and his son devised a business model to operate a private jet charter business on a national scale. This was apparently an innovative concept because charter services had traditionally been local, independently-operated businesses.

[Appellant] planned to operate eight aircraft management facilities across the country. In order to effectuate this plan and to save what remained of Sentient, [Appellant] undertook a corporate reorganization. Sentient had defaulted on a loan to its senior lender, Sovereign Bank. Under [Appellant's] direction, Sentient sold off some of its assets, repaid the loan and started a campaign to attract new investors. Sentient changed its name to JetDirect and assumed TAG/Sentient's liabilities (i.e. its contractual obligations). JetDirect did not receive the $1.8 million dollars that [McKesson] had paid TAG to deposit in its bank account; rather, it booked that amount as a liability.

[Appellant] was not able to attract enough investors to give JetDirect sufficient cash to weather its difficulties. The charter and corporate jet service businesses were heavily damaged by the recession and the industry was rife with rumors about JetDirect's financial woes caused by the company from [sic] expanding too quickly and adopting a new accounting system that disastrously slowed its ability to bill clients.

[McKesson] was aware of at least some of JetDirect's business difficulties and decided to reevaluate their airplane services contract. [McKesson] hire[d] [a] consultant who reviewed JetDirect's finances and issued a report dated September 10, 2008 in which he concluded that JetDirect was indeed in fragile financial shape and highly leveraged, but the consultant did not think [McKesson's] operating funds were at risk.

JetDirect's position continued to deteriorate, however and it began delaying [payment] to various creditors. In early February [2009], JetDirect's fuel supplier refused to extend it credit for refueling at local airports around the country and JetDirect informed its customers, including [McKesson] that henceforth they would have to purchase their own fuel. This news alarmed [McKesson] employee Robert Pocica who was in charge of administering the aircraft management contract with JetDirect. He contacted [McKesson's] legal department to begin arrangements to terminate [McKesson's] relationship with JetDirect. Pocica tried in vain to get information about the state of [McKesson's] operating fund but every JetDirect employee he spoke to told him he had to speak to [Appellant,] and [Appellant] was never available to talk with him.[1]

¹ Pocica testified that he tried to reach [Appellant] several times by phone and email but that [Appellant] never returned the messages.

In the meantime, [Appellant] decided to use [McKesson's] operating fund to meet its payroll expenses. He claimed that he discussed this matter with the [sic] JetDirect's Board, but he was not able to identify anyone who remained on the board at this point in time [February 2009] except for a Mr. Rosenheim. JetDirect's financial condition did not improve and by mid January, [Appellant] knew that JetDirect would have to be sold and closed down. [Appellant] attempted to sell the aircraft management charter portion of JetDirect, but the investors backed out in February 2009 after examining JetDirect's finances.

On February 25, 2009, Sovereign Bank notified JetDirect that it intended to sell off or transfer JetDirect's assets at a foreclosure sale.² [Appellant] and Sovereign Bank negotiated foreclosure proceedings and agreed to a plan in which Sovereign foreclosed on JetDirect's loan and sold its assets, but not its liabilities at a private sale to JetDirect Aviation [JDA] which had been formed to acquire the assets of JetDirect. Wayfarer Aviation acquired JDA and Arcadia Aviation acquired Wayfarer. Wayfarer and Arcadia failed and went out of business. Jet Direct filed for bankruptcy on May 1, 2009.

² On February 27, [Appellant] informed Mr. Pocica in a phone conversation that Sovereign Bank had seized JetDirect's assets.

[Appellant] testified that he did not discuss this matter with Rosenheim, "[m]ore likely I informed him of my decision. It wouldn't have been his decision to make." [Appellant] admitted that there was a point after [McKesson] requested the return of its money where he would have been able to return it without the approval of Sovereign Bank, but that he chose not to.³

³ [Appellant's] testimony supported [McKesson's] claim for personal liability under a participation theory of liability.

Trial Court Opinion, 11/17/14, at 1-4 (internal citations omitted).

The trial court summarized the procedural history of this case as follows:

[McKesson] filed a lawsuit against [Appellant] on October 14, 2010,[4] claiming fraudulent and negligent misrepresentation, conversion, aiding and abetting conversion[,] aiding and abetting breach of fiduciary duty, breach of contract.[1][2] By the time of trial, the only claim remaining [was] one for conversion against [Appellant].[5] On January 16, 2014, a jury returned a verdict in favor of [McKesson] and against [Appellant] in the amount of $1,476,584.00.

[4] [McKesson] also sued Wayfarer Aviation D/B/A JDA Acquisition Company and several incarnations of Arcadia Aviation. These businesses are defunct and are no longer parties to the case.

[5] The Honorable Jack Snite granted [Appellant's] motion for summary judgment on [t]he claims for fraudulent and negligent misrepresentation. The remaining claims were withdrawn by [McKesson].

Both sides filed post trial motions[6] and oral argument was held on June 5, 2014. On July 29, 2014 the court denied [Appellant's] motion for judgment notwithstanding the verdict or in the alternative for a new trial and directed the Prothonotary to enter judgment in favor of [McKesson] in the [amount] of 1,476,584.00. This appeal followed.

[6] [McKesson] withdrew its motion on March 5, 2014.

The court issued a 1925(b) order and [Appellant] filed a [Pa.R.A.P. 1925(b)] statement.

_____

[1] The Complaint set forth the following claims against Appellant Campbell: conversion, fraudulent misrepresentation, negligent misrepresentation, breach of fiduciary duty, negligence, aiding and abetting conversion, and aiding and abetting breach of fiduciary duty. Complaint, 10/14/10, at 1-28.

[2] Appellant filed a motion for summary judgment on July 17, 2012.

Trial Court Opinion, 11/17/14, at 5.

Appellant presents the following issues for our review:

A. Whether the Trial Court Committed Prejudicial Error in Failing to Instruct the Jury in the Requested Manner on the Relationship between Conversion and Breach of Contract, on the Economic Loss Doctrine and on the Gist of the Action Doctrine?

B. Whether the Trial Court Erred in Ruling in Response to [Appellant's] Post-Trial Motion that the Claim for Conversion is Distinct from the Contract between TAG and McKesson?

C. Whether the Trial Court Erred in Denying [Appellant's] Motion for JNOV or, in the alternative, a New Trial, by Failing to Apply Correctly the Gist of the Action Doctrine to the Claim for Conversion?

D. Whether the Trial Court Erred in Denying [Appellant's] Motion for JNOV or, in the alternative, a New Trial, by Failing to Discuss or Apply the Economic Loss Doctrine to the Claim for Conversion?

E. Whether the Trial Court Erred in Denying [Appellant's] Motion for JNOV or, in the alternative, a New Trial, by Failing to Consider the Relevant Case Law Demarcating the Boundary Between Breach of Contract and Conversion?

F. Whether the Trial Court Erred in Denying [Appellant's] Motion for JNOV or, in the alternative, a New Trial, by Failing to Recognize or to Discuss the Impact of the Non-Existent and/or the Erroneous Charges to the Jury with Regard to the Gist of the Action Doctrine, the Economic Loss Doctrine and the Impact of the Contractual Nature of McKesson's Loss on a Claim for Conversion?

G. Whether the Trial Court Committed Prejudicial Error When It Declined to Instruct the Jury on the Gist of the Action doctrine, the Economic Loss doctrine or the Impact of the Contractual Nature of McKesson's Loss on a Claim for Conversion?

Appellant's Brief at 6-7.

The thrust of Appellant's argument is that the conversion claim should have been dismissed because the claim arose directly from the contract between the parties. Appellant's Brief at 18. Thus, Appellant argues, the trial court erred in failing to grant its motion for judgment notwithstanding the verdict ("JNOV") on the conversion claim. Appellant's Brief at 19, 49. In support of its position, Appellant presents the following argument:

> McKesson's conversion claim was closely linked to the aviation services contract entered into by McKesson with TAG. The contract alone dictated the obligation of JetDirect to pay funds to McKesson upon termination, dictated the terms under which money would be paid to McKesson, and determined the amount, if any, that would be due to McKesson. Absent the contractual obligation imposing a duty on JetDirect (and before that TAG) to pay to McKesson certain of the operating funds attributable to McKesson's jets upon termination of the contract, JetDirect would have had no obligation to make any payment to McKesson.

Appellant's Brief at 18. Appellant contends that conversion claims are barred, as part of the law of conversion itself, when the alleged conversion is based solely on contractual liability and failure to pay money owed under that contract. *Id.* Appellant also maintains that the legal doctrines of the gist of the action and economic loss bar recovery for conversion under these circumstances. *Id.*

There are two bases on which the court can grant judgment n.o.v.:

> [O]ne, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that even with all factual inferences

decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

In an appeal from the trial court's decision to deny judgment n.o.v.,

we must consider the evidence, together with all favorable inferences drawn therefrom, in a light most favorable to the verdict winner. Our standard of review when considering motions for a directed verdict and judgment notwithstanding the verdict are identical. We will reverse a trial court's grant or denial of a judgment notwithstanding the verdict only when we find an abuse of discretion or an error of law that controlled the outcome of the case. Further, the standard of review for an appellate court is the same as that for a trial court.

*Drake Mfg. Co. v. Polyflow, Inc.*, 109 A.3d 250, 258-259 (Pa. Super. 2015) (internal citation omitted).

Additionally, we have defined conversion[3] as follows:

---

[3] A choice of law question as to whether California or Pennsylvania law applies in this case has been raised. As the trial court stated in its opinion disposing of Appellant's motion for summary judgment: "a false conflict exists since the laws of Pennsylvania and California are the same with respect to [conversion] claims." Trial court opinion, 1/9/13, at 6 n.4. *See Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221, 233, 166 Cal. Rptr. 3d 864, 874 (2014) ("[A] mere contractual right of payment, without more, will not suffice" to support a claim for conversion.). Appellant maintains that Pennsylvania law applies in this matter. Appellant's Reply Brief at 6. McKesson concedes that there are no apparent conflicts with Pennsylvania and California law with respect to the elements of conversion. McKesson's Brief at 28.

*(Footnote Continued Next Page)*

Conversion is a tort by which the defendant deprives the plaintiff of his right to a chattel or interferes with the plaintiff's use or possession of a chattel without the plaintiff's consent and without lawful justification. *Chrysler Credit Corporation v. Smith*, 434 Pa.Super. 429, 643 A.2d 1098, 1100 (1994), *appeal denied*, 539 Pa. 664, 652 A.2d 834 (1994). "A plaintiff has a cause of action in conversion if he or she had actual or constructive possession of a chattel at the time of the alleged conversion." *Id.* Money may be the subject of conversion. *Francis J. Bernhardt, III, P.C. v. Needleman*, 705 A.2d 875, 878 (Pa.Super.1997) (quoting *Shonberger v. Oswell*, 365 Pa.Super. 481, 530 A.2d 112, 114 (1987)). However, the failure to pay a debt is not conversion.

In general, courts are cautious about permitting tort recovery based on contractual breaches. *See Glazer v. Chandler*, 414 Pa. 304, 308, 200 A.2d 416, 418 (1964); *Bash v. Bell Telephone Company of Pennsylvania*, 411 Pa.Super. 347, 601 A.2d 825 (1992). [. . . .] The conceptual distinction between a breach of contract claim and a tort claim has been explained as follows:

> Although they derive from a common origin, distinct differences between civil actions for tort and contractual breach have been developed at common law. Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals.... To permit a promisee to sue his

*(Footnote Continued)* _____

Thus, this Court will apply the forum law of Pennsylvania on conversion which, for the reasons discussed *infra*, we find dispositive in this case. *See Budtel Associates, LP v. Continental Cas. Co.*, 915 A.2d 640, 643 (Pa. Super. 2006), ("the first step in a choice of law analysis under Pennsylvania law is to determine whether [an actual] conflict exists between the laws of the competing states. If no [actual] conflict exists, further analysis is unnecessary."); *see also Am. Hearing Aid Associates, Inc. v. GN Resound N. Am.*, 309 F. Supp. 2d 694, 704 n. 14 (E.D. Pa. 2004) (applying Pennsylvania law to conversion claim where there was no apparent conflict with Pennsylvania law and the law of California).

promisor in tort for breaches of contract *inter se* would erode the usual rules of contractual recovery and inject confusion into our well-settled forms of actions.

*Id.* (quoting **Bash, supra** at 829) . . . . "The important difference between contract and tort claims is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie from the breach of duties imposed by mutual consensus." **Id.** (quoting **Redevelopment Auth. v. International Ins. Co.,** 454 Pa.Super. 374, 685 A.2d 581, 590 (1996) (*en banc* ), *appeal denied,* 548 Pa. 649, 695 A.2d 787 (1997)). "In other words, a claim should be limited to a contract claim when the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied by the law of torts." **Id.** (*quoting* **Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.,** 247 F.3d 79, 104 (3rd Cir.Pa.2001), *cert denied,* 534 U.S. 1162, 122 S.Ct. 1173, 152 L.Ed.2d 116 (2002)).

**Pittsburgh Const. Co. v. Griffith**, 834 A.2d 572, 581-582 (Pa. Super. 2003).

The record reflects the following evidence. As outlined above, McKesson entered into a contract with TAG on February 24, 2006, to provide services designed to keep McKesson's corporate jets operating safely and efficiently. Trial Exhibit P-1; Appellant's Motion for Summary Judgment, 7/17/12, "Exhibit B", Agreement, 2/24/06, at 1-27. Pursuant to Section 12.3 of the contract, McKesson agreed to deposit with TAG an operating fund in the amount equal to two times the average monthly aircraft expense to cover the working capital requirements for McKesson's three aircraft and to serve as a security deposit. *Id.* at 12. Section 12.3(b) of the contract provided that the operating fund would be "reflected as a credit balance in

Provider's [TAG's] accounting records of McKesson's accounts." *Id.* Section 12.3(b) also provided that any balance reflected in TAG's accounting records for McKesson's account remained the property of McKesson and would be returned to McKesson following expiration of the agreement. *Id.* at 12-13.

David Weil, CFO and Executive Vice President at TAG, executed the contract on behalf of TAG.[4] Appellant's Motion for Summary Judgment, 7/17/12, "Exhibit D," Deposition of Dave Weil, 4/23/12, at 10, 16. He testified that upon receipt of the $1.8 million operating fund from McKesson, TAG placed the operating fund into its general business operating bank account, from which it would then pay all of the aircraft expenses incurred on behalf of McKesson. *Id.* at 19, 75-77. At no time did TAG place the operating fund into a separate bank account. *Id.* at 19. Rather, the operating fund was commingled with the general operating funds available to TAG to operate its business. *Id.* at 75-77. When asked how McKesson's money was accounted for on the TAG books, Mr. Weil responded that "for the gross amount of the deposit, there was a customer deposit liability set up because it was owed." *Id.* at 19. Mr. Weil further explained that "[a]

_____

[4] David Weil's videotaped deposition was played at trial. N.T., 1/14/14, at 7. Additionally, the parties filed a stipulation pursuant to Pa.R.A.P. 1926(b), supplementing the record with the transcript of David Weil's deposition, presented to the jury by video-presentation on day two of trial. Stipulation, 2/13/15, at 2.

short-term liability was set up, and an offsetting asset in the cash account was created." *Id.* at 76.

Additionally, Mark Dennen, Director of Finance at TAG, testified that the McKesson operating fund was commingled with TAG's general operating funds.[5]  Appellant's Motion for Summary Judgment, 7/17/12, "Exhibit E," Deposition of Mark Dennen, 4/24/12, at 6, 32-33.  Mr. Dennen also testified that by the fall of 2008, operating funds were being used to pay TAG's most urgent bills, namely payroll, and other liabilities were not being met in order to meet payroll.  *Id.* at 51-52.  He further explained that there were operating deposits on TAG's books, and "we all intuitively knew that these clients had given us money, and that when we were running out of money, that we would never be able to repay them their operating deposit." *Id.* at 52.

Becky Nelson started as a controller with TAG and was later promoted to Director of Finance, and remained with the company through the transition from TAG, to Sentient, to JetDirect.[6]  Appellant's Motion for

---

[5] The videotaped deposition of Mark Dennen was played at trial.  N.T., 1/14/14, at 6.  Additionally, the parties filed a stipulation pursuant to Pa.R.A.P. 1926(b), supplementing the record with the transcript of Mark Dennen's deposition, presented to the jury by video-presentation on day two of trial.  Stipulation, 2/13/15, at 1.

[6] The videotaped deposition of Becky Nelson was played at trial.  N.T., 1/13/14, at 133.  Additionally, the parties filed a stipulation pursuant to Pa.R.A.P. 1926(b), supplementing the record with the transcript of Becky
*(Footnote Continued Next Page)*

Summary Judgment, 7/17/12, "Exhibit F," Deposition of Becky Nelson, 4/23/12, at. 7-8. Ms. Nelson also testified that the McKesson operating fund was never placed into a segregated bank account, but instead was commingled into TAG's operating account. *Id.* at 48. When Sentient purchased TAG, the operating funds were not transferred to separate bank accounts. *Id.* During the time Ms. Nelson was employed by JetDirect, she lost authority to pay McKesson's invoices directly and testified that accounts were becoming overdue. McKesson's Response to Appellant's Motion for Summary Judgment, 8/30/12, "Exhibit K," Deposition of Becky Nelson, 4/23/12, at 21, 30-31. She testified that at that point, McKesson's money was not available in the California account to pay McKesson's bills. *Id.* at 31. Ms. Nelson stated that she was required to get approval from Mr. Rosenheim, JetDirect's Treasurer, before paying McKesson's vendors, and she was to report to Rosenheim which bills were the "most desperate to pay." *Id.* at 30, 47. Ms. Nelson further testified that by late summer of 2008, invoices from vendors serving McKesson's planes were not being paid. *Id.* at 43, 49.

Robert Pocica, Senior Vice President, Chief Security Officer at McKesson, who was responsible for McKesson's aviation program, testified that he had no knowledge regarding whether or not the operating fund was

*(Footnote Continued)* ——————————

Nelson's deposition, presented to the jury by video-presentation on day one of trial. Stipulation, 2/13/15, at 2.

to be held in a segregated account separate from TAG's own operating funds. N.T., 1/13/14, at 40-41, 73. It was Mr. Pocica's understanding that TAG was using McKesson funds to operate the aircraft and pay expenses on McKesson's behalf. *Id.* at 73, 85. Mr. Pocica also testified that when Sentient was the management company, he had no knowledge as to whether Sentient was keeping McKesson's operating fund deposit in its general cash accounts. *Id.* at 87. From McKesson's point of view, the handling of McKesson's operating fund did not change as the services provided moved from TAG, to Sentient, to JetDirect. *Id.* at 87.

The record further reflects that on December 17, 2007, McKesson agreed to the assignment of TAG's rights and responsibilities under the contract to Sentient. N.T., 1/15/14, at 38-39, Trial Exhibit P-11; Appellant's Motion for Summary Judgment, 7/17/12, "Exhibit I," Assignment Agreement, 12/17/07. Thus, by January 2008, TAG's assets, including the customer contracts, were acquired by Sentient. N.T., 1/14/14, at 76-82.

Appellant was Chairman of the Board of Sentient Jet Holdings, LLC, the parent company of Sentient, when Sentient acquired TAG in early 2008. N.T., 1/14/14, at 73-76. Appellant testified that during the acquisition, customer deposit liabilities were acquired from TAG. *Id.* at 82. Appellant provided the following explanation: "Sentient assumed the liability, so it showed up as a liability on our books, the customer deposit liability, but none of the cash from the operating funds actually came over, that was

- 14 -

actually retained by T[AG]. So, we never actually possessed the $1.8 million as part of JetDirect/Sentient." *Id.* at 82. When asked whether he knew what TAG did with McKesson's operating fund, Appellant answered: "They distributed it to [TAG's] shareholders, I believe." *Id.* In any event, Appellant explained, the operating fund cash did not transfer to Sentient. *Id.* at 83; N.T., 1/15/14, at 6. Appellant explained that while the assignment indicated that the balance of the operating fund would transfer from TAG to Sentient, "[t]he cash was never transferred. The liability, the owners account liability was transferred." N.T., 1/15/14, at 40.

As part of Sentient's continued efforts to restructure and improve its financial condition, in August of 2008, Sentient sold the Sentient Jet card business along with the rights to the Sentient name. N.T., 1/14/14, at 89-93. As a result, Sentient changed its name to JetDirect Aviation Inc. ("JetDirect"). *Id.* at 93. Appellant took over as CEO of JetDirect in September of 2008, after the sale of Sentient. *Id.* at 91. Appellant's goal as CEO was to restructure the JetDirect operation. *Id.* at 89-92.

Appellant further testified that any payment made by McKesson on invoices provided by JetDirect were deposited in "the concentration account" JetDirect maintained at Sovereign Bank. 1/15/14, at 9. Appellant testified that Sentient/Jet Direct had only the single "concentration account" at Sovereign Bank, where all deposits were made. *Id.* at 9. Appellant

provided the following explanation regarding the account at Sovereign Bank

after the acquisition:

> I will go back to the acquisition of the assets of T[AG], which were basically the client contracts. We had a revolving line of credit with Sovereign Bank, and it was what's known as a zero cash balance account. So cash balances would be paid down to zero, and the amount of the line of credit would be reduced. And that's not atypical of a fairly large corporation that's trying to maximize its cash utilization when it has that. So, we never had material cash balances from one day to the balance, every – the end of every day the cash balance was basically wiped down to zero. We used the line of credit then to fund whatever capital deposits we had during the month, where there w[ere] peeks and valleys we used the line of credit.

*Id.* at 23-24. Appellant confirmed that is how the payments and operating

funds were handled from the time that TAG was acquired. *Id.* at 24.

After JetDirect's financial status began to deteriorate, McKesson

provided a notice of termination to JetDirect in February of 2009, and

demanded return of the remaining balance of the operating fund. N.T.,

1/1/5/14, at 10-11. On or about February 27, 2009, Appellant informed Mr.

Pocica that Sovereign Bank had seized all of JetDirect's assets, and that

JetDirect was not in a financial position to return any of McKesson's

operating fund. *Id.* at 11-12.

Frank Morrissey, an expert witness in the area of insolvency,

bankruptcy and credits, also testified for the defense. N.T., 1/15/14, at 112.

The following testimony was elicited regarding the handling of McKesson's

operating fund:

[Appellant's Counsel]: Now, the jury has heard testimony that everything was commingled, everybody's money went into the pot when they came on board and gave an operating fund. And the jury also heard Becky Nelson testify that McKesson's operating fund was never placed in a segregated account, and was placed in, has a general operating account. And we also heard Dave Weil testify that McKesson's money was commingled with the operating funds of JetDirect. So, you can't definitively say what money was used for what. I m[e]an it was all fungible in this one account.

And we have also heard Greg Campbell testify that this practice did not change up until the time that McKesson terminated the contract with JetDirect. Based on this testimony do you have an opinion to a reasonable declare of professional certainty as to whether a payment from JetDirect Aviation, Inc., a checking account, to McKesson in February, 2009 would be a transfer or a payment that the trustee in bankruptcy would consider a preference[7]?

[Mr. Morrissey]: I do. The fact that McKesson allowed money to advance from the management agreement to be held in a commingled account in the name of T[AG], initially, and then JetDirect later, and that McKesson allowed JetDirect

---

[7] In his previous testimony, Mr. Morrissey explained "a preference" as follows:

A preference is a technical cause of action of the banking code . . . . One of the key prime policies of the banking code is quality distribution to similar situated preference. People, similar creditors get treated similarly in bankruptcy.

Preference law implements this key banking policy by acquiring creditors who receive a payment on the eve of bankruptcy, to return that payment if the payment allows the creditor to receive more than they would receive in a bankruptcy case, in a nut shell. That's what a preference is.

N.T., 1/15/14, at 114.

and T[AG] to control [disbursements] from that account is legally significant. That – those – that fact, that record, those facts bring any payment from the commingled account within the umbrella of the preference statute. Any payment from an account where funds are commingled, and it's in control of a Chapter 7 debtor will make it property, for purposes of the preference statute.

The co-mingling account and the fact that the McKesson money was not kept in a segregated, a sequestered account in McKesson's name is very, very important, has a lot of significance in this situation.

N.T., 1/15/14, at 128-129.

The evidence supports Appellant's claim that Sentient/JetDirect did not receive the $1.8 million dollar operating fund that McKesson originally had paid to TAG; rather, through the acquisition, Sentient/JetDirect assumed that amount as a liability. The abundant testimony regarding the co-mingling of McKesson's operating fund with TAG's general operating account, and TAG's subsequent exhaustion of its funds and inability to repay customers' operating deposits is consistent with this claim. The Agreement between the parties provided that upon termination of the agreement, the money in McKesson's operating fund should be returned to McKesson. Therefore, McKesson's claim for repayment of its money arises from the Agreement entered into by the parties.

Thus, in this action, McKesson is attempting to recover the money it was owed under the agreement with TAG and later assigned to Sentient/ JetDirect. Appellant's alleged failure to return the money to McKesson was a breach of duty imposed by mutual consensus as reflected in the agreement.

- 18 -

Without the agreement, Appellant and Sentient/JetDirect would have no obligation to pay McKesson any amount of money. Thus, Appellant's breach was not of duties imposed by law or social policy, as is required in a conversion claim. *See Hart v. Arnold*, 884 A.2d 316, 339 (Pa. Super. 2005) (The critical conceptual distinction between a breach of contract claim and a tort claim is that the former arises out of "breaches of duties imposed by mutual consensus agreements between particular individuals," while the latter arises out of "breaches of duties imposed by law as a matter of social policy.").

Instead, a debt was owed by JetDirect to McKesson. JetDirect failed to pay that debt. As noted, it is well-settled that failure to pay a debt is not conversion. *Francis J. Bernhardt III, P.C. v. Needleman*, 705 A.2d 875, 878 (Pa. Super. 1997). Additionally, the claim for conversion rests on the same facts as would a claim for breach of contract. Claims for conversion have been consistently disallowed where such claims are based on the same facts as the contract claim. *Pittsburgh Construction Co.*, 834 A.2d at 584.

The evidence of record compels the conclusion that Appellant is entitled to judgment as a matter of law. Even with all factual inferences decided adverse to Appellant, the law nonetheless requires a verdict in his favor. *Drake Mfg. Co.*, 109 A.3d at 258. McKesson's claim for repayment of the operating fund was based on the contract entered into by the parties.

McKesson sought repayment of funds owed under the contract. Therefore, the claim for conversion against Appellant cannot succeed. The trial court erred as a matter of law in failing to grant Appellant's motion for JNOV on the conversion claim. Accordingly, we reverse the order denying Appellant's motion for JNOV, vacate the judgment, and remand for entry of JNOV in favor of Appellant.

Judgment reversed; case remanded for entry of JNOV in favor of Appellant. Jurisdiction is relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/24/2015